# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 3933 | **DATE** | 10/11/2012 |
| **CASE TITLE** | Lakeview Collection LLC vs. Bank of America | | |

**DOCKET ENTRY TEXT**

Defendant's motion to dismiss or for judgment on the pleadings [172] is denied. Status hearing set for 11/13/12 is stricken and reset to 10/24/12 at 8:30 a.m.

■[ For further details see text below.]  Notices mailed by Judicial staff.

## STATEMENT

Before the Court is Defendant Bank of America, N.A.'s self-described "Motion to Dismiss or for Judgment on the Pleadings." (R. 172, Def.'s Mot.) For the reasons explained below, the motion is denied.[1]

| | Courtroom Deputy Initials: | KF |
|---|---|---|

---

[1] As Plaintiff points out, the present motion represents Defendant's fourth "bite at the apple." (Pl.'s Resp. at 13.) Defendant raised the same argument in three prior motions, namely a motion to dismiss and the associated motions for reconsideration and to certify an interlocutory appeal. All were properly denied and the Court cautions Defendant against filing successive motions for reconsideration on the same issue. *See, e.g.*, *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (citing *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (noting the "limited function" of motions for reconsideration of interlocutory orders to "correct manifest errors of law or fact")).

I.  **Allegations in the Complaint**[2]

   A.  **Background**

In 2005, LaSalle Bank N.A. ("LaSalle") owned real estate in Chicago, Illinois, located at 3201 North Ashland Avenue (the "Main Parcel"), and at 3301 North Ashland Avenue (the "Drive-Up Parcel"). (Am. Compl.[3] & Am. Ans.[4] ¶ 5.) LaSalle operated banking facilities on both parcels. (*Id.* ¶¶ 5-6) LaSalle additionally had an option to purchase another property located at 3225 North Ashland Avenue in Chicago, Illinois (the "Option Parcel"). (*Id.* ¶ 5.) LaSalle "desired to exercise its option to acquire the Option Parcel and to sell all three parcels for development prior to 2005." (Am. Compl. ¶ 7.)

LaSalle and Plaintiff Lakeview Collection LLC ("Lakeview") worked together on a potential purchase and redevelopment of the three properties. (*Id.* ¶ 8.) Lakeview intended to redevelop the properties into a "mixed-use" complex "containing a building with retail, a branch bank and residential condominiums." (*Id.*) LaSalle "desired" to close on the sale prior to the end of 2005, which was sooner than Lakeview could begin redevelopment. (*Id.* ¶¶ 7, 9.) Lakeview would incur "carry costs" in excess of $121,000.00 per month if the deal were to close before it could begin redevelopment. (*Id.* ¶¶ 11-13.)

To "facilitate" the transaction, "LaSalle and Lakeview agreed" to a sale-leaseback arrangement, whereby the sale would close by the end of 2005, and LaSalle would simultaneously "enter into a lease with Lakeview and pay Lakeview the carry cost of the parcels [in the form of rent] during the period needed to complete the process necessary to begin construction." (*Id.* ¶ 13.) The "rent came to $1,457,467.50 annually." (*Id.*)

   B.  **Agreements**

On December 29, 2005, the parties executed three separate agreements: the Purchase Agreement (or "PA"); the Existing Space Lease (or "ESL"); and the Temporary Space Lease (or "TSL"). (*See* Am. Compl. & Am. Ans. ¶¶ 15, 18-19.)

---

[2]Plaintiff alleges the following facts in the Amended Complaint. Defendant has answered the Amended Complaint and admitted certain facts, which are so designated with a citation to the Amended Complaint and the Amended Answer. Additionally, both parties rely on certain contracts to which the Amended Complaint refers. Neither party has raised an objection. Two of the contracts are annexed to the Amended Complaint (Am. Compl., Ex A (Existing Space Lease or "ESL") & Ex. B (Temporary Space Lease or "TSL").) The other contract, referred to in the Amended Complaint, was previously filed in connection with Defendant's prior motion to dismiss. (R. 13, Ex. A (Purchase Agreement or "PA").) The Court may properly consider each of these agreements on a motion for judgment on the pleadings under Rule 12(c). *See* Fed. R. Civ. P. 10(c); *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661-62 (7th Cir. 2002)).

[3]Citations to "Am. Compl." refer to the Amended Complaint, filed at docket # 62.

[4]Citations to "Am. Ans." refer to the Amended Answer to the Amended Complaint, and supplemental amendments, filed at docket # 108, as amended in part by docket # 156.

### 1. Purchase Agreement

Under the terms of the Purchase Agreement, Lakeview agreed to purchase the Drive-Up Parcel for $5,455.000; the Option Parcel for $1,375,000; and the Main Parcel for $13,273,000. (PA § 1.) The Rider to the Purchase Agreement expressly conditioned the sale upon the parties entering into the Existing Space Lease, the Temporary Space Lease, and later, a Branch Lease for "space in the to-be constructed" complex in the redevelopment. (*Id.*, R-3(a)-(c).)

### 2. Existing Space Lease

Under the terms of the Existing Space Lease Agreement, LaSalle agreed to lease the Main Parcel and the Drive-Up Parcel from Lakeview for an annualized base rent of $1,457,467.50, payable in monthly installments. (ESL § 3(a).) The agreement included the following recitals:

> WHEREAS, the parties entered into a [Purchase Agreement] and Rider of even date herewith ("Sales Contract") for the sale and purchase of certain real estate including parcels located at 3201 North Ashland Avenue ("Main Parcel"); 3301 North Ashland Avenue ("Drive-Up Parcel"); and 3225 North Ashland Avenue ("Optional Parcel") in Chicago, Illinois.
>
> WHEREAS, the Landlord intends to redevelop the Main Parcel and Option Parcel in accordance with the terms of the [Purchase] Agreement and as mutually agreed to by the parties.
>
> WHEREAS, after the closing of the transaction contemplated by the [Purchase] Agreement (the "Closing"), Tenant intends to continue its business operations at the Main Parcel until such time as Tenant has constructed a temporary, alternative site for its operations on the Drive-Up Parcel and/or on an alternative site and Tenant has moved its Main Parcel operations to the Drive-Up Parcel and/or alternate site.
>
> WHEREAS, contemporaneously with herewith, the parties entered into a Temporary Space Lease Agreement dated of even date herewith, for the Drive-Up Parcel ("Temporary Space Lease").
>
> WHEREAS, the parties desire that the Landlord lease to Tenant the Premises, as hereinafter defined, subject to the terms and conditions of the Lease.

(ESP, Recitals.) Section 2 governed the lease term:

> <u>Lease Term</u>. The term of this Lease ("Term") shall commence on the Closing . . . and shall terminate on the date that is the later of (i) August 31, 2006, or (ii) one hundred and twenty days after Landlord provides written notice to Tenant that Landlord intends to demolish the structures on the Main Parcel and commence construction at the Main Parcel, in any event subject to the terms of Section 3(b) below.

(ESL § 2.) Section 3(b) in turn provided:

> Notwithstanding the foregoing, in the event that and for so long as (x) the tenants under the third party leases on the Option Parcel . . . remain in possession after the Expiration date, or (y) Tenant has not relocated its business operations to a temporary branch space, then this Lease shall remain in full force and . . . until (aa) the date that the last [third party tenants] vacates the Option Parcel . . . ; or (bb) the date that Tenant relocates its business operations to a temporary branch space and surrenders possession of the Main Parcel . . . . The provisions of this Paragraph shall survive the

termination of this Lease.

(*Id.* § 3(b); *see also* Am. Compl. & Am. Ans. ¶¶ 18, 20-21.) Other pertinent provisions include Section 9 – "At the end of the Term, Tenant shall deliver the Main Parcel to Landlord in an "as is" condition" – and Section 11 – "In [the event of condemnation], the Temporary Space Lease shall go into effect." (ESL §§ 9, 11.)

### 3. Temporary Space Lease

Under the terms of the Temporary Space Lease, Lakeview LaSalle agreed to lease the Drive-Up Parcel from Lakeview for an annualized base rent of $395,487.50, payable in monthly installments. (TSL §§ 1, 3.) The agreement included the following recitals:

> WHEREAS, the parties entered into a [Purchase Agreement] and Rider of even date herewith ("Sales Contract") for the sale and purchase of certain real estate including certain parcel located at 3301 North Ashland Avenue in Chicago, Illinois ("Drive-Up Parcel").
>
> WHEREAS, Landlord intends to redevelop the Property pursuant to the time-line and other terms and conditions contained in the [Purchase] Agreement.
>
> WHEREAS, Tenant intends to operate a bank branch in the new development referred to herein as the "Complex" in accordance with the terms of the [Purchase] Agreement, and intends to enter into a "Branch Lease" for certain premises in the Complex described in the [Purchase] Agreement ("Replacement Bank Branch").
>
> WHEREAS, during the construction of the Complex, the parties desire that the Landlord lease to Tenant the Drive-Up Parcel to allow Tenant to continue its operations until Tenant takes possession of the new leases space in the Complex.

(TSL, Recitals.) Section 2 governs the term of the lease and provided in part:

> The term of this Lease ("Term") shall commence on the date of termination of the lease between Landlord and Tenant executed on the date hereof (the "Existing Space Lease"), which Existing Space Lease includes the Premises as part of the leases premises thereof ("Commencement Date") and shall terminate on the date the earlier to occur of (i) one hundred eighty (180) days after notice from Landlord to Tenant delivering possession of the Replacement Bank Branch (as defined in the Recitals), or (ii) the date Tenant commences business operations at the Replacement Bank Branch ("Expiration Date").

(*Id.* § 2.)

### C. The Present Dispute

For some time thereafter, LaSalle continued to operate banking facilities on the Main Parcel and the Drive-Up Parcel and paid rent to Lakeview pursuant to the Existing Space Lease. (Am. Compl. ¶¶ 22, 27.) "Lakeview diligently pursued completion of the pre-construction development issues but due to a downturn in the economy, among other things, the development was delayed." (*Id.* ¶ 27.) Specifically, "Lakeview took steps to clear the building on the Main Parcel by terminating existing tenants and relocating other tenants, but Lakeview was not ready to begin construction." (*Id.* ¶ 28; *see also* Am. Ans. ¶ 28 (admitting that Lakeview "terminated the leases of existing tenants occupying the building on the Main Parcel").) "At no time did Lakeview ever provide

written notice to LaSalle in accordance with the terms for the Existing Space Lease, that Lakeview intended to demolish the structures on the Main Parcel and commence construction at the Main Parcel, thereby terminating the Existing Space Lease." (Am. Compl. ¶ 29.)

In or about May of 2008, LaSalle vacated the Main Parcel. (Am. Compl. & Am. Ans. ¶ 30.) LaSalle "relocated" its banking operations from the Main Parcel to "another bank location." (Am. Compl. ¶ 30.) Despite vacating the Main Parcel in May of 2008, LaSalle continued to pay base rent due under the Existing Space Lease until October of 2008, and then ceased paying any rent on the Main Parcel. (Am. Compl. & Am. Ans. ¶ 34.) LaSalle continued to occupy the Drive-Up Parcel, but purported to do so under the Temporary Space Lease, not the Existing Space Lease. (Am. Compl. ¶¶ 31, 35-36.)

In or about October of 2008, Defendant Bank of America, N.A. "acquired LaSalle and succeeded to the rights and obligations of LaSalle under the Existing Space Lease and the Temporary Space Lease." (*Id.* ¶ 32; *see also* Am. Ans. ¶ 32 (admitting only that the entities "merged").)

## II. Procedural History

On May 26, 2009, Plaintiff Lakeview Collection, LLC filed a single count complaint against Defendant Bank of America, N.A. (as successor-in-interest to LaSalle) in the Circuit Court of Cook County, Illinois. (R. 1, Ex. A.) In the complaint, Plaintiff sought a declaration that the Existing Space Lease had not terminated, and that Defendant remained liable to pay rent under the Existing Space Lease. (*Id.*) On June 30, 2009, Defendant removed the action to the United States District Court for the Northern District of Illinois on the basis of diversity jurisdiction. *See* 28 U.S.C. §§ 1332 and 1441. The case was initially assigned to the Honorable Blanch M. Manning, but later reassigned to this Court. (R. 184, Exec. Comm. Order (8/6/12).)

On August 3, 2009, Defendant moved to dismiss the complaint under Rule 12(b)(6), arguing, among other things, that it did not breach the Existing Space Lease. Defendant reasoned, with reference to a Sixteenth Century English case – *Say v. Smith*, 75 Eng. Rep. 410, 1 Plow. 269 (1563) – that the lease was either void or terminable-at-will because it lacked a definitive end date. (R. 91.) The court denied Defendant's motion on December 5, 2009, and later denied reconsideration on January 13, 2010. (R. 20, 26.) In written orders, the court explained that under current Illinois law, "a lease is not void or terminable-at-will merely because it lacks a definitive termination date, but rather, as with ordinary contracts, a lease that terminates upon the occurrence of an event is terminable upon the occurrence of the event, not at will." (R. 91, Order at 1 (discussing prior orders).) The court also reasoned that two other events – condemnation and/or notice of default – "could trigger termination and, therefore, the lease terminated upon the occurrence of those events, not at will." (*Id.*) Defendant then filed its answer to the complaint. (R. 27, 52.)

On October 13, 2010, Plaintiff filed an amended complaint (the "Amended Complaint") that re-alleges Count I (declaration of validity of Existing Space Lease) and adds two counts of breach of contract. In Count II, Plaintiff alleges in the alternative that the Existing Space Lease terminated, and Plaintiff breached the Temporary Space Lease by failing to pay rent. In Count III, Plaintiff alleges that Defendant breached the Existing Space Lease by failing to pay rent, thereby causing Plaintiff to default on its mortgage.

On November 3, 2010, Defendant filed a motion to dismiss Counts II and III of the Amended Complaint under Rule 12(b)(6). (R. 172.) The court denied the motion on March 17, 2011, reasoning (1) as to Count II, that Defendant improperly challenged the nature of the relief that Plaintiff sought; and (2) as to Count III, that Defendant's challenge to the foreseeability of alleged damages fails in light of the well-pleaded allegations of reasonable foreseeability. (R. 91.)

Defendant filed its Answer and Affirmative Defenses to the Amended Complaint on February 19, 2011, as amended on July 7, 2011 and amended in part March 3, 2012 (collectively, the "Amended Answer"). (R. 94, 108, 156.) Discovery closed on May, 30, 2012. (R. 166.)

On July 16, 2012, Defendant filed the present motion, which is now fully briefed. (*See* 172, 173, 194, 206.) As explained below, the motion is denied.

### III. Legal Standard

Defendant captions its motion as a "Motion to Dismiss or for Judgment on the Pleadings." *See* Fed. R. Civ. P. 12(b)(6) & 12(c). Because the pleadings have closed, *see* Fed. R. Civ. P. 7(a), the Court will construe Defendant's filing as a motion for judgment on the pleadings under Rule 12(c). The standard of review for either motion, however, is the same.

Rule 12(c) provides that after "the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) 'is designed to provide a means of disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court may take judicial notice.'" *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp., Inc.*, No. 10-CV-1533, 2011 WL 1196894, at *2 (N.D. Ill. Mar. 29, 2011) (quoting *Cin. Ins. Co. v. Contemporary Distrib., Inc.*, No. 09-CV-2250, 2010 WL 338943, at *2 (N.D. Ill. Jan. 26, 2010)). The same legal standard that applies to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) applies to motions under Rule 12(c). *See Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). To survive a Rule 12(c) motion, then, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the speculative level, assuming that all well-pleaded allegations in the complaint are true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Wozniak v. Argonne Nat'l Lab.*, No. 09-CV-7702, 2010 WL 3958426, at *3 (N.D. Ill. Oct. 1, 2010).

### IV. Analysis

Here, Defendant seeks judgment on the pleadings on basis that the parties never formed a valid lease for a term of years, and therefore the lease is terminable at will. Under prevailing Illinois law, "four essential elements are required to create a valid lease: (1) a definite agreement as to the extent and bounds of the property leases; (2) *a definite and agreed term*; (3) a definite agreement as to the rental; and (4) the time and manner of payment." *Ricke v. Ricke*, 83 Ill. App. 3d 1115, 39 Ill. Dec. 598, 405 N.E.2d 351 (Ill. App. Ct. 1980) (emphasis added); *see also Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 180, 289 Ill. Dec. 420, 819 N.E.2d 1220 (Ill. App. Ct. 2004) Attacking the second element, Defendant argues that "the end of the term of the Existing Space Lease was indefinite and uncertain" because it "could not be determined by reference to any objective facts at the time the lease was signed." (Def.'s Mot. ¶ 2.) Specifically, Defendant reasons that Section 2 of the Existing Space Lease did not provide for a specific date by which Plaintiff must issue the written notice of termination, thus depriving the lease of an objective end point. Without a definite duration, Defendant contends that the lease was terminable at will, and thus Defendant could not have breached the lease by vacating the Main Parcel.

In support of its argument, Defendant relies on *Say v. Smith*, a decision of the Court of Common Pleas of England and Wales handed down "in the Easter Term, in the sixth Year of the Reign of Queen Elizabeth" (also known as the year 1563). *Say* involved an oral lease of twenty acres of land. The lessor granted the lessee a perpetual ten-year demise in the land, as long as the lessor paid a set price. After some time, the lessor terminated the lease and seized the lessee's cattle on the land. The lessee then sought replevin, which the court denied. The court reasoned that the oral lease was not valid because it lacked "certainty of the time for which the lessee shall

have the land." Therefore, the court held that lessee shall "take nothing by" his writ but shall "be in Mercy for his false Claim." According to Defendant, *Say* stands for the proposition that "a lease for years must have a definite and certain time at which it begins and ends, and where the end of the term is indefinite and uncertain the agreement creates not a valid and legal lease for a term of years but merely a tenancy at will." (Def.'s Mem. at 1.)

Although decided before the time of William Shakespeare and Galileo Galilei, Defendant argues that the rule of *Say v. Smith* "is the law of Illinois" by virtue of the Illinois Common Law Act of 1818, 5 ILCS 50/1. The Act provides as follows:

> The common law of England, so far as the same is applicable and of a general nature, and all statutes or acts of the British parliament made in aid of, and to supply the defects of the common law, prior to the fourth year of James the First, excepting the second section of the sixth chapter of 43d Elizabeth, the eighth chapter of 13th Elizabeth, and ninth chapter of 37th Henry Eighth, and which are of a general nature and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority.

5 ILCS 50/1; *see also Lasier v. Wright*, 304 Ill. 130, 136 N.E.2d 545 (1922) ("It has been the rule of this court to adopt the decisions of the English courts in laying down the rules of the common law so far as they are applicable to conditions and usages in this country, and also in construing statutes taken from the mother country."); *Penny v. Little*, 3 Scam. 301, 1841 WL 3322 (Ill. 1841) (stating that the statute adopts the English common law as of the "period at which the first territorial government was established in America").

Although the Illinois Common Law Act may have initially incorporated *Say v. Smith* as the rule of decision in Illinois, the common law has since evolved. *See Little*, 3 Scam. 301 (explaining that the "common law is a beautiful system" that continuously evolves "as the nation advance[s] in civilization, virtue, and intelligence"); *Sylvester v. Buda Co.*, 281 Ill. App. 139, 141, 1935 WL 3641 (Ill. App. Ct. 1935) ("the common law, or unwritten law, is not inflexible but is constantly changing according to custom, as found in the decisions of the courts"). Rather than blind adherence to the common law norms of the Sixteenth Century, the Illinois Supreme Court has explained that the "we must look to American legislation and the reports of American courts for improvements and modifications in the common law." *Little*, 3 Scam. 301; *see also People ex rel. Keenan v. McGuane*, 13 Ill.2d 520, 535-36, 150 N.E.2d 168 (1958) (explaining that the "common law which the statute adopted is a system of elementary rules and of general judicial declarations of principles, which are continually expanding with the progress of society, adapting themselves to the gradual changes of trade, commerce, arts, inventions, and the exigencies and usages of the country") (internal quotation marks and citation omitted).

As the Illinois Appellate Court explained in *Illinois Central Railway Co.*: "Our society has become infinitely more complex since the day of *Say v. Smith*. Industrial and commercial relationships especially require subtle and intricate expression not to be embraced adequately in a single word provided by the scrivener's art." *Ill. Cent. Railway Co. v. Mich. Cent. Railway Co.*, 18 Ill. App. 2d 462, 152 N.E.2d 627 (1958) ("Thus it is common for parties to designate as leases, agreements which the lawyers of even a century ago would be unable to recognize as such."). Defendant points to only one Illinois decision that has applied the rule of *Say* – *Stanmeyer v. Davis*, 321 Ill. App. 227, 53 N.E.2d 22 (Ill. App. Ct. 1944) – but indeed, that same court expressly (and persuasively) disavowed the decision less than two decades later. In so doing, the court reasoned that the "rule in *Stanmeyer v. Davis* arises out of a past now so remote, it is difficult for us to understand the reasons which gave it birth." *Ill. Cent. Railway Co.*, 18 Ill. App. 2d at 486.

Although it remains true that "a contract which fails to fix a time for its duration . . . is ordinarily terminable at the will of either [party]," Illinois courts have tempered this rule by endeavoring to effectuate the

intent of the contracting parties. *See Yale Sec., Inc. v. Freedman Sales*, No. 96 C 6501, 1997 WL 51428, at *3 (N.D. Ill. Feb. 3, 1997) (holding that the agreement was not indefinite in duration, where the parties reasonably expected that the termination triggering event would occur); *Ricke,* 83 Ill. App. Ct. at 1119 ("Whether a contract fixing no period of duration is terminable at the option of one of the parties depends upon a construction of the agreement and ascertainment of the intent of the parties"); *Ill. Cent. Railway Co.*, 18 Ill. App. 2d at 487-88 ("Where the courts of another day adhered rigidly to a prescribed meaning for the word used, we have learned to ask: 'What was the intention?' 'What is involved?' 'What is its purpose?' 'What is reasonable?'").

In *Consolidated Labs., Inc. v. Shandon Scientific Co.*, for example, the plaintiff distributor filed suit against the defendant manufacturer, alleging breach of a five year exclusive distributorship contract. 413 F.2d 208 (7th Cir. 1969) (applying Illinois law). After the parties entered into this exclusive contract, they executed a letter of intent that permitted the plaintiff to continue as the exclusive distributor until a new exclusive distributor was named, at which time the plaintiff would become a dealer of the product. *Id.* at 211. The defendant manufacturer, however, never named a new distributor and terminated the letter of intent. *Id.* The district court concluded that the underlying contract was indefinite in duration and therefore was terminable at will. *Id.* The Seventh Circuit reversed, and held that the agreement was not "indefinite in duration and thus terminable at will." *Id.* at 211-12. The court reasoned that it is "abundantly clear that the agreement was to continue in effect until [the defendant] appoints a new main distributor and [the plaintiff] becomes a main dealer . . . ." *Id.* at 211. "The contract is not for an indefinite period," the court reasoned, "but rather it is terminable upon the occurrence" of an event, which is "in the sole control" of the defendant. *Id.* at 212.

Here, the Court concludes, as a matter of law, that the Existing Space Lease is not indefinite in duration, and therefore is not terminable at will.[5] *See Consolidated Labs., Inc.,* 413 F.3d at 211-12. *Accord First Bank & Trust*, 276 F.3d at 322 (holding that construction is a question of law where the language of the contract makes the parties' intent clear). Reading the lease as a whole, it is clear that the parties intended the lease to be of a limited and reasonably certain duration to effectuate the parties' contractual purpose: to allow Defendant to maintain its operations on the Main Parcel until Plaintiff begins demolition and construction on the Main Parcel, at which time Defendant would relocate to a temporary bank location and eventually to the redeveloped property.

Beginning with the plain language of the lease, the lease sets up numerous specific termination events. (*See, e.g.*, ESL §§ 2-3 (various circumstances related to redevelopment), 11 (condemnation), 20 (default); *cf. id.* § 9 ("At the end of the Term . . . .").) Perhaps most notably, Section 2 contemplates that Plaintiff will issue a notice of intent to demolish the Main Parcel and begin construction on the redevelopment project. (*Id.* § 2.) If Plaintiff does so before August 31, 2006, the lease shall not terminate until that date. (*Id.*) But in all circumstances, Section 3 extends the termination date under certain circumstances, including where Defendant has not yet relocated to the temporary location or where other non-party tenants have not yet vacated. (*Id.* § 3.).

The recitals contained in the Existing Space Lease, read together with Sections 2 and 3, further establish that the parties intended the lease to be of a limited, reasonably certain duration. *See Hagene v. Derek Polling Const.* 388 Ill. App. 3d 380, 385, 327 Ill. Dec. 883, 902 N.E. 2d 1269 (Ill. App. Ct. 2009) ("While recitals are not an operational part of a contract between the parties, they reflect the intent of the parties and influence the way

---

[5]Defendant focuses its motion on the Existing Space Lease and largely ignores the validity of the Temporary Space Lease. In a footnote, Defendant suggests that its legal argument under *Say v. Smith* applies with equal force to both leases. (Def.'s Mot. ¶ 2 n. 2.) Consistent with Defendant's presentation of the issues, the Court does not consider the validity of the Temporary Space Lease specifically, but assumes, as does Defendant, that the analysis would be the same.

the parties constructed the contract. The contract recitals create a context through which the operational portion of the contract can be better understood, because they indicate the relevant circumstances to its execution.") (internal quotation marks, alterations and citations omitted); *Badger v. Gallaher,* 113 Ill. 662, 1885 WL 8227 (Ill. Sup. Ct. 1885) ("The recitals contained in an agreement are a part of it, and may restrain or limit the generality of the operative part; and if the operative part be doubtful or ambiguous, the recitals may be used."). One of the recitals states that Plaintiff "intends to redevelop the Main Parcel," and another states that Defendant "intends to continue its business operations at the Main Parcel until such time as Tenant has constructed a temporary, alternative site for its operations."

Moreover, the nature of the overall real estate transaction, including the terms of the other simultaneous agreements, further demonstrates the parties' contractual purpose and intent to be bound for a limited and reasonably certain duration. *See Gallagher v. Lenart*, 226 Ill.2d 208, 314 Ill. 2d. 208, 874, N.E.2d 43 (2007) ("We further note the long-standing principle that instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as one contract and will be construed together."). The Temporary Space Lease, to which the Existing Space Lease expressly refers, was to "commence upon the termination" of the Existing Space Lease and run until Plaintiff gives notice to Defendant "delivering possession of the Replacement Bank Branch" or Defendant "commences business operations at the Replacement Bank Branch." (TSL § 2.) One of the recitals to the Temporary Space Lease states that Plaintiff "intends to develop the Property pursuant to the time-line and other terms and conditions contained in the [Purchase Agreement]." (*Id.*, Recitals; *see also* PA, R-3(a)-(c).) Indeed, the Purchase Agreement, to which both lease agreements refer, "is expressly conditioned" upon the parties entering into the Existing Space Lease and the Temporary Space Lease. (PA, R-3; *see also id.*, R-9(a)-(b) (stating that Plaintiff intends to redevelop the properties; that Plaintiff provided Defendant with tentative development plans; and that Plaintiff shall proceed with redevelopment pursuant to a specific timeline).)

For these reasons, the Existing Space Lease is not void for lack of a definite duration. The parties' intent to enter into a limited lease, for a specific objective, is clearly and unambiguously reflected in the language of the Existing Space Lease, as well as the other simultaneous agreements between the parties. As in *Recke*, "[t]o hold that this was an indefinite contract, terminable at the will of either party, would be contrary to the intent of the parties." *Ricke*, 83 Ill. App. 3d at 1121. The lease may be "silent as to what happens if the Plaintiff never gives the contemplated notice" of redevelopment (Def.'s Reply at 2), but the lease as a whole makes clear that the parties did not intend to enter into a perpetual lease or a lease for a term so uncertain that the parties could not contemplate its end. *Cf. Say v. Smith*, 75 Eng. Rep. 410, 1 Plow. 269 (1563) (invalidating lease that granted a "perpetual demise of the land, from ten years to ten years continually following, and out of the memory of man"); *R.J.N. Corp. v. Connelly Food Prods., Inc.*, 175 Ill. App.3d 655, 660, 125 Ill. Dec. 108, 529 N.E.2d 1184 (1988) (holding that the duration of a contract was indefinite, where the parties agreed to be bound for so long as the one party continues to deliver products to the customers of the other party).

Although the contract does not provide a specific end date, the parties reasonably expected that the development project would occur in the near term. This clear expression is sufficient to fix the term of the lease for purposes forming a valid lease.[6] *See, e.g.*, *Yale Sec., Inc. v. Freedman Sales, Ltd.*, No. 96 C 6501, 1997 WL

---

[6]Alternatively, as Judge Manning reasoned, the lease was sufficiently definite in duration because "two other events – (1) condemnation, or (2) notice by Lakeview to Bank of America of an event of default – could also trigger termination, and, therefore, the lease terminated upon the occurrence of those events, not at all." (R. 91, Order.) The Court acknowledges Defendant's disagreement with Judge Manning's reasoning, but need not dwell on this disagreement in light of the discussion above. *Cf. Yale Sec., Inc.*, 1997 WL 54128, at *3; *Lake Forest Academy v. Am.*

54128 (N.D. Ill. Feb. 3, 1997) (holding that contract was not indefinite in duration, where the parties reasonably expected that the termination triggering event would occur); *Stein v. Isse Koch & Co., Chi.*, 350 Ill. App. 171, 112 N.E.2d 491 (Ill. App. Ct. 1953) (holding that a during "for the period of plaintiff's service in the Army" was "sufficient to fix the term" of the agreement). *Cf. E.J. Brach Corp., v. Gilbert Int'l, Inc.*, No. 90 C 1399, 1991 WL 148914, at *3 (N.D. Ill. June 18, 1991) ("[C]onsidering the contract as a whole, if a period of duration can fairly and reasonable be implied, it will be enforced. . . . What the reasonable length of duration may be is a question for the trier of fact."); *Raskas Foods, Inc., Inc. v. S.W. Whey, Inc*., 978 S.W.2d 46 (Mo. App. Ct. 1998) ("We acknowledge that Illinois courts recognize that a contract may be enforceable if it is terminable upon the occurrence of a cognizable event, even in the absence of a specific termination date.").

Because the Existing Space Lease is not terminable at will, it is "to be enforced according to its terms and reasonable implication thereof."[7] *Consol. Labs, Inc.*, 413 F.2d at 211-12 (citations omitted). For purposes of lease formation, as discussed above, it is enough to say that the lease at issue is sufficiently definite. *See, e.g.*, *Comdisco, Inc. v. Dun & Bradstreet Corp*., 306 Ill. App. 3d 197, 713 N.E.2d 698 (Ill. App. Ct. 1999) (pointing out the distinction between contract formation and contract interpretation). The issue of the precise interpretation of the duration of the lease "term," for purposes of Plaintiff's claims of breach, is not before the Court. *Cf. Carrico v. Delp*, 141 Ill. App. 3d 684, 690, 95 Ill. Dec. 880, 490 N.E.2d 972 (Ill. App. Ct. 1986) ("When the continuation of a contract is without definite duration, the law will imply a reasonable time.").

## V.  Conclusion

Accordingly, Defendant's motion is denied.

---

*Language Academy*, 777 F. Sup. 610, 616-17 (N.D. Ill. 1991) (contract term not indefinite where either party may terminate upon breach); *Raskas Foods, Inc.,* 978 S.W.2d at 50 ("We acknowledge that Illinois courts recognize that a contract may be enforceable if it is terminable upon the occurrence of a cognizable event, even in the absence of a specific termination date.") (citing *Consol. Labs., Inc.*, 413 F.2d 208; *Donahue v. Rockford Showcase & Fixture Co.*, 87 Ill. App. 2d 47, 230 N.E.2d 278, 281-82 (Ill. App. Ct. 1967)).

[7]Under Illinois law, "[t]he rules adopted for interpreting a lease are the same rules used to interpret a contract." *Clarendon Am. Ins. Co. v. Prime Group Realty Servs., Inc.*, 389 Ill. App. 3d 724, 729, 329 Ill. Dec. 687, 907 N.E.2d 6 (Ill. App. Ct. 2009). "In interpreting any contract, the court's objective is to give effect to the parties' intent." *MCK Millennium Centre Parking, LLC v. Cent. Parking Sys., Inc*., No. 10 C 8295, 2012 WL 1932616, at *5-6 (N.D. Ill. May 29, 2012) ("*Millennium Parking*"). The first step is to "examine the terms of the contract itself." *Millennium Parking,* 2012 WL 1932616, at *6. The "parties' intent is determined first by looking to the plain and ordinary meaning of the contract language on its face," and considered "as a whole," while giving "effect to all of its parts." *Id.* If after considering the entire contract, the court determines that the pertinent provisions are "unambiguous," then the "court will enforce it as written, without looking to extrinsic evidence." *Id.* (citing *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009)); *see also First Bank & Trust,* 276 F.3d at 322 ("interpretation of an unambiguous contract is a question of law"). If, on the other hand, the court determines that the pertinent provisions are ambiguous, "then extrinsic evidence is admissible 'to explain and ascertain what the parties intended.'" *Millennium Parking,* 2012 WL 1932616, at *6 (quoting *Curia v. Nelson*, 587 F.3d at 829).