### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Lakeview Collection Inc., | ) | |
| | ) | No. 09 C 3933 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| | ) | |
| Bank of America, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Lakeview Collection Inc. ("Lakeview") and defendant Bank of America, N.A. ("Bank"),[1] executed three separate agreements related to a real estate development project. Lakeview purchased property from the Bank intending to redevelop it into a mixed-use complex where the Bank would then operate a bank branch. This sale was memorialized as the Purchase Agreement. Contemporaneously with this purchase, the Bank agreed to lease the property back from Lakeview until development began, continuing to operate bank facilities at that location. The leaseback agreement was memorialized as the Existing Space Lease Agreement. And finally, in connection with the two aforementioned agreements, the Bank agreed that upon termination of the Existing Space Lease, it would continue to lease one of the parcels of property on which it intended to

---

[1] LaSalle Bank is the predecessor in interest of Bank of America, N.A. R. 235. n. 1. Throughout this opinion, Bank of America shall be referred to as the Bank except in situations where the party involved was LaSalle Bank, in which case the Court will refer to LaSalle Bank as LaSalle.

operate its drive-through facility until it could take possession of lease space in the newly developed complex. This agreement was memorialized as the Temporary Space Lease Agreement. For some time thereafter, the Bank operated its banking facilities on the property and paid the carrying costs of that property or "rent" to Lakeview pursuant to the Existing Space Lease. Lakeview meanwhile pursued redevelopment and pre-construction activities. Lakeview did not begin construction on the property because of difficult credit markets, and the Bank subsequently vacated that property and eventually stopped paying rent.

Lakeview filed suit against the Bank in the Circuit Court of Cook County, Illinois. The Bank removed the case to federal court pursuant to 28 U.S.C. §§ 1332(a), 1441(a). R. 1. Lakeview alleges three counts in the governing complaint. R. 62. Count I seeks a declaratory judgment that the Existing Space Lease has not terminated and that the Bank remains liable for rent and real estate taxes. Count II, pled in the alternative to Count I, alleges a breach of contract based on the Bank's failure to pay rent due under the Temporary Space Lease. Count III alleges that the Bank breached the Existing Space Lease by failing to pay rent, thereby causing Lakeview to default on its mortgage with its lender. The Bank now moves for partial summary judgment on counts I and III of Lakeview's amended complaint. R. 237, 256. Also before the Court are: (1) the Bank's Motion to Strike Lakeview's Supplemental Answer to Interrogatory No. 6 and Statements of Facts Based on Those Facts, R. 282; (2) the Bank's motion regarding the recent sale of the property to Target, R. 297; (3) Lakeview's motion for leave to take a Rule 30(b)(6)

deposition of the Bank regarding its commercial lending practices, R. 304; and (4) Lakeview's motion to take limited discovery regarding witnesses recently identified in the Bank's untimely witness disclosures, R. 306. For the reasons below, the Bank's motions to strike and for partial summary judgment are denied. The remaining motions are also denied.

## Background

The facts and evidence set forth below are construed as favorably to Lakeview as the record and Local Rule 56.1 require. *See Harners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In considering the Bank's summary judgment motions, the Court gives Lakeview the "benefit of conflicts in the admissible evidence and favorable inferences from that evidence" but does not vouch for them. *Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

### A.    Negotiation

In 2005, LaSalle Bank, N.A. ("LaSalle") owned property at 3201 North Ashland Avenue (the "Main Parcel") and at 3301 North Ashland Avenue (the "Drive-Up Parcel"), both located in Chicago, Illinois. R. 273, Pl. Statement of Additional Facts ("PSAF") ¶ 1. LaSalle operated a branch bank on the Main Parcel and a drive-through ATM facility on the Drive-Up Parcel. PSAF ¶ 1; R. 241, Def. Statement of Facts ("DSOF") ¶¶ 6, 7. LaSalle also had an option to purchase another property located at 3225 North Ashland Avenue in Chicago, Illinois (the "Option Parcel"). PSAF ¶ 1. Other tenants occupied the building space at the Option Parcel. DSOF ¶ 7.

3

LaSalle wanted to sell the Main Parcel and the Drive-Up Parcel before the end of 2005. PSAF ¶ 2. To achieve this goal, LaSalle negotiated with Lakeview on a deal where Lakeview would purchase the properties from LaSalle and redevelop them. DSOF ¶¶ 8, 14. Lakeview then intended to demolish the buildings on the Main and Option Parcels, construct new buildings, and redevelop the properties into a "mixed-use complex" ("Complex"), consisting of retail facilities, underground parking, and a residential condominium building on top of the retail facilities. DSOF ¶ 14. Also included in the new Complex would be a new branch bank for LaSalle. DSOF ¶ 15. While construction and development was occurring on the Main Parcel to develop it into the Complex, LaSalle anticipated that its branch currently on the Main Parcel would be relocated to a temporary location until development and construction was complete, at which time LaSalle would then occupy a space in the new Complex. DSOF ¶ 15. Although LaSalle wished to close the deal by the end of 2005 to show a "substantial profit on its 2005 results," that was sooner than Lakeview could begin development. PSAF ¶ 5. To accommodate LaSalle's desire to close by the end of 2005, Lakeview agreed to purchase the property "early." PSAF ¶ 5. As part of this agreement, LaSalle would pay the "carry costs" of these parcels, in the form of rent, while Lakeview completed the process necessary to begin demolition and construction. PSAF ¶¶ 9, 12.

## B. Agreements

On December 29, 2005, LaSalle and Lakeview executed three separate agreements regarding the sale of the property: (1) the Purchase Agreement; (2) the

Existing Space Lease Agreement; and (3) the Temporary Space Lease Agreement. R. 242-2, Exh. 2, Purchase Agreement; R. 242-8, Exh. 6, Existing Space Lease Agreement; R. 242-8, Exh. 7, Temporary Space Lease Agreement. At the time these agreements were executed, there was a "rather robust market of development activity." PSAF ¶18.

### 1.      Purchase Agreement

The Purchase Agreement governed the sale of the property, providing that Lakeview would purchase the Drive-Up Parcel from LaSalle for $5,455,000; the Option Parcel for $1,375,000; and the Main Parcel for $13,273,000. R. 242-2 at 2. The purchase price of the three properties plus closing costs totaled $20,250,750. DSOF ¶ 8. The Rider to the Purchase Agreement made the sale contingent on the entry of the Existing Space Lease Agreement, the Temporary Space Lease Agreement, and a Branch Lease for space in the newly constructed Complex. R. 242-2 at 4-6, Purchase Agreement § R-3(a)-(c). It further memorialized Lakeview's plan to redevelop the properties into a mixed-use complex.

Under section 9(c) of the Rider:

Upon Closing, Purchaser shall endeavor to obtain zoning and access approvals from applicable governmental authorities ("Approvals"), prepare the Final Redevelopment Plans, and commence and complete construction of the Complex, in accordance with the time-line agreed to by the parties set forth below ("Redevelopment Time-Line"), subject in the case of each deadline (except for the "Outside Date" hereinafter defined), to Force Majeure. For purposes hereof, "Force Majeure" shall mean any failure to comply or delay in complying with any obligations under this Agreement if such failure or delay is due to acts of God, the acts of Seller, the Option Parcel owner or their respective affiliates, strikes or other labor disturbances, lockouts, the reasonably unforeseeable inability to obtain materials, future governmental

> restrictions, reasonably unforeseen interpretations of existing governmental restrictions, delays in receiving permits not due to the actions of Purchaser, enemy actions, civil commotion, fire, unavoidable casualty, adverse weather conditions or other similar causes beyond Purchaser's reasonable control and not reasonably foreseeable, but not including delays caused by lack of funds.

R. 242-2 at 11, § R-9(c). The redevelopment timeline also provided, among other things, that Lakeview would: (1) "diligently pursue" all zoning approval relating to the Complex and receive those approvals by October 1, 2006; (2) "diligently proceed" with demolition of the existing structures on the Main and Option Parcels and to complete that demolition no later than February 28, 2007; (3) "diligently pursue" all building permits relating to the construction of the Complex and endeavor to receive such building permits by April 2, 2007; and (4) commence construction of the improvements and site work for the Complex no later than 20 business days after receipt of the building permits. DSOF ¶ 25; R. 242-2 at 11, § R-9(a), (c)(i), (iii)-(v).

Section 9(d) of the Rider then sets out deadlines for obtaining building permits, construction contracts, and zoning amendments and dates by which Lakeview was to have completed demolition and commenced construction of the Complex:

> No later than Monday, June 30, 2008 ("Outside Date"), Purchaser shall have (i) obtained all Building Permits required for the construction of the Complex; (ii) obtained all amendments, special use permits, variances, approvals or other changes to the zoning and/or other use ordinances and restrictions affecting the Complex, (iii) obtained signed construction contracts in connection with the construction of the Complex, (iv) completed the demolition of existing structures on the Main Parcel and the Option Parcel and site clearing, and (v) commenced substantial construction of the Complex ("Outside Date Requirements"). A failure to comply with all of the Outside Date Requirements shall constitute a "Material Delay" and thereupon Seller

6

may elect to terminate the Temporary Space Lease and the Branch Lease without any further obligations thereunder by providing written notice to Purchaser ("Lease Termination Option Notice") delivered no later than August 1, 2008. Seller shall vacate and surrender the premises within a time period mutually agreed to by the parties . . . . The foregoing remedy shall be Seller's exclusive remedy applicable to the failure of Purchaser to satisfy the Outside Date, the parties acknowledging and agreeing that in no event shall Seller be entitled to recover any monetary damages from Purchaser or enforce any other remedies. With regard to the Outside Date, Seller and Purchaser expressly agree and acknowledge that TIME IS OF THE ESSENCE and shall not be subject to delays by Force Majeure or any other events except for delays related to the Option Parcel Third Party Leases.

R. 242-2 at 12, § R-9(d).

To finance the purchase, Lakeview obtained an Acquisition Loan of $17 million; $15,250,750 of that $17 million was initially drawn and used to buy the property, and the remaining balance of $1,750,000 was reserved for pre-development expenses. DSOF ¶ 9. Lakeview contributed $5 million to purchase the property and financed the remainder of the balance through two promissory notes secured by a mortgage, an assignment of rent, and additional security given to LaSalle and Wachovia Bank, N.A. DSOF ¶¶ 9, 67; PSAF ¶ 6. Under the Notes, LaSalle and Wachovia each agreed to lend Lakeview up to $8,500,000. PSAF ¶ 6; *see also* DSOF ¶ 67. Lakeview's principals Arthur Slaven, Sol Barket, and John McLinden personally guaranteed all of Lakeview's obligations to the lenders. PSAF ¶ 6. LaSalle would later sell its 50% interest in the Lakeview Promissory Note to Wachovia, which then eventually became Wells Fargo. DSOF ¶ 67; PSAF ¶ 24. The initial maturity date of the Acquisition Loan was June 29, 2007. DSOF ¶ 12.

LaSalle profited from the sale "somewhere between five and ten million" dollars. PSAF ¶ 7.

### 2. Existing Space Lease Agreement

Under the terms of the Existing Space Lease Agreement, Lakeview and LaSalle agreed that LaSalle would lease the Main Parcel and the Drive-Up Parcel from Lakeview for an annual rent of $1,457,467.50, payable in monthly installments. DSOF ¶ 18. This Lease included the following recitals:

> WHEREAS, the parties entered into a [Purchase Agreement] and Rider of even date herewith ("Sales Contract") for the sale and purchase of certain real estate including certain parcels located at 3201 North Ashland Avenue ("Main Parcel"); 3301 North Ashland Avenue ("Drive–Up Parcel"); and 3225 North Ashland Avenue ("Option Parcel") in Chicago, Illinois;
>
> WHEREAS, the Landlord intends to redevelop the Main Parcel and the Option Parcel in accordance with the terms of the [Purchase] Agreement and as mutually agreed to by the parties;
>
> WHEREAS, after the closing of the transaction contemplated in the [Purchase] Agreement (the "Closing"), Tenant intends to continue its business operations at the Main Parcel until such time as Tenant has constructed a temporary, alternate site for its business operations on the Drive-Up Parcel and/or on an alternate site and Tenant has moved its Main Parcel operations to the Drive-Up Parcel and/or alternate site;
>
> WHEREAS, contemporaneously herewith, the parties entered into a Temporary Space Lease Agreement dated of even date herewith, for the Drive-Up Parcel ("Temporary Space Lease"); and
>
> WHEREAS, the parties desire that the Landlord lease to Tenant the Premises, as hereinafter defined, subject to the terms and conditions of this Lease.

R. 242-8 at 4, Exh. 6, Existing Space Lease Agreement Recitals. Section 2, which governs the lease term, provides:

2.      Lease Term. The term of this Lease ("Term") shall commence on the Closing . . . and shall terminate on the date that is the later of (i) August 31, 2006, or (ii) one hundred and twenty days (120) after Landlord provides written notice to Tenant that Landlord intends to demolish the structures on the Main Parcel and commence construction at the Main Parcel, in any event subject to the terms of Section 3(b) below.

R. 242-8 at 4, § 2. Section 3 is titled "Rent" and section 3(b) in turn provides:

Notwithstanding the foregoing, in the event that and for so long as (x) the tenants under the third party leases on the Option Parcel . . . remain in possession after the Expiration Date, or (y) Tenant has not relocated its business operations to a temporary branch space, then this Lease shall remain in full force and effect . . . until (aa) the date that the last [third party tenants] vacate[ ] the Option Parcel . . .; and (bb) the date that Tenant relocates its business operations to a temporary branch space and surrenders possession of the Main Parcel . . . . The provisions of this Paragraph shall survive the termination of this Lease.

R. 242-8 at 5, § 3(b). Other relevant provisions in the Existing Space Lease Agreement include sections 9 and 13, which provide respectively: "At the end of the Term, Tenant shall deliver the Main Parcel to Landlord in an 'as is' condition"; and "In [the event of condemnation], the Temporary Space Lease shall go into effect." R. 242-8 at 7, §§ 9, 13.

### 3.      Temporary Space Lease Agreement

The Temporary Space Lease Agreement provided that LaSalle would lease the Drive-Up Parcel from Lakeview for an annual rent of $395,487.50, payable in monthly installments. DSOF ¶ 21.

WHEREAS, Landlord intends to redevelop the Property pursuant to the time-line and other terms and conditions contained in the [Purchase] Agreement[.]

WHEREAS, Tenant intends to operate a bank branch in the new development referred to herein as the "Complex" in accordance with the terms of the [Purchase] Agreement, and intends to enter into a "Branch Lease" for certain premises in the Complex described in the [Purchase] Agreement ("Replacement Bank Branch").

WHEREAS, during the Construction of the Complex, the parties desire that the Landlord lease to Tenant the Drive-Up Parcel to allow Tenant to continue its operations until Tenant takes possession of the new leased space in the Complex[.]

R. 242-8 at 19, Exh. 7, Temporary Space Lease Agreement Recitals. Section 2 governs the term of the lease and provided in part:

The term of this Lease ("Term") shall commence on the date of termination of the lease between Landlord and Tenant executed on the date hereof (the "Existing Space Lease"), which Existing Space Lease includes the Premises as part of the leased premises thereof ("Commencement Date") and shall terminate on the date the earlier to occur of (i) one hundred eighty (180) days after notice from Landlord to Tenant delivering possession of the Replacement Bank Branch (as defined in the Recitals), or (ii) the date Tenant commences business operations at the Replacement Bank Branch ("Expiration Date").

R. 242-8 at 19, § 2.

The parties thus contemplated that following the termination of the Existing Space Lease, LaSalle would continue to occupy the Drive-Up Parcel and pay rent pursuant to the Temporary Space Lease, and LaSalle would use the Drive-Up Parcel during the construction of the new development on the Main and Option Parcel. DSOF ¶ 20.

## C.   Events Leading up to the Bank's Vacating of the Property

For some time thereafter, LaSalle continued to operate banking facilities on the Main Parcel and Drive-Up Parcel and paid "rent" to Lakeview pursuant to the Existing Space Lease. Meanwhile, Lakeview pursued completion of demolition and

construction. On December 20, 2006, LaSalle entered into an agreement to lease property located at 3111 North Ashland Avenue, intending to use the location as a temporary branch location pending construction of the Complex. DSOF ¶ 28. As part of the redevelopment of the property, on June 15, 2007, Lakeview took steps to clear out the building on the Main Parcel by terminating the leases of two of the existing tenants occupying the building, informing them that construction would begin in the summer of 2007. DSOF ¶ 30.

A few months later, on September 28, 2007, Lakeview and LaSalle executed an agreement—memorialized as the Retail Branch Bank Lease—where LaSalle agreed to lease space from Lakeview in the Complex. DSOF ¶ 34. The Retail Bank Branch Lease provided a preliminary development schedule that contemplated that demolition would commence on January 30, 2008 and be completed by February 19, 2008. DSOF ¶ 35. Such a schedule was realistic at the time of the formation of the Retail Branch Bank Lease. DSOF ¶ 36. In December, LaSalle obtained a building permit to construct the temporary bank branch at 3111 North Ashland Avenue. DSOF ¶ 37.

Unfortunately, by the late fall of 2007, the market for condominiums had "stopped"; indeed, financing sources for condominium projects "became difficult, if not impossible" towards the end of 2007. DSOF ¶ 40; PSAF ¶¶ 19, 20. As a result, Lakeview was forced to adjust its development plan, ultimately deciding to turn the condominium component of the project into apartment housing because that would be the optimum use of the property given the shaky market. DSOF ¶¶40, 41; PSAF

11

¶ 20. The change in the redevelopment plan from condominiums to apartment housing delayed the commencement of construction because it required modification of the architectural plans, thereby delaying the issuance of building permits. DSOF ¶ 44. When Lakeview informed LaSalle of its change in plans, LaSalle was not surprised given the downturn in the economy. PSAF ¶ 21.

In February 2008, Lakeview sent a letter to LaSalle, informing LaSalle that it was moving forward with the development of the Complex. R. 242-14, Exh. 20, Letter dated Feb. 29, 2008. In the letter, Lakeview noted that it did not expect to begin demolition until the fall of 2008 and proposed moving the June 30, 2008 Outside Dates in the Branch Bank Lease and Temporary Space Lease to March 30, 2009. *Id.* By April 2008, the construction start date had been delayed until October 2008, but Lakeview still felt "reasonably confident" that development would proceed, that building permits would be obtained by October 2008, and that construction would then commence. DSOF ¶¶ 48, 51.

In April 2008, LaSalle informed Lakeview that it was moving out of the Main Parcel on May 4, 2008 and that it would no longer pay rent under the Existing Space Lease. PSAF ¶ 25. Indeed, consistent with its statement, on that date, LaSalle vacated the Main Parcel and relocated its banking operations from the Main Parcel to a temporary branch space. DSOF ¶¶ 52, 58. On June 10, 2008, Lakeview alerted LaSalle via letter that it was in breach of the Existing Space Lease and that its obligations under that lease had not terminated. DSOF ¶ 57; PSAF ¶ 25; R. 242-14, Exh. 23, June 10, 2008 Letter. Lakeview noted LaSalle's

12

June $65,914.58 payment, but informed LaSalle that $55,541.04 remained outstanding. DSOF ¶ 56. Several weeks later, on June 26, 2008, LaSalle informed Lakeview that it was tendering possession of the Main Parcel pursuant to section 3(b) of the Existing Space Lease, that it would no longer pay rent under that lease, and that it would only pay rent under the Temporary Space Lease. DSOF ¶ 59. LaSalle informed Lakeview that because it had relocated to a temporary branch space and because there were no longer any third party tenants on the Option Parcel location, LaSalle was no longer required to pay rent under the Existing Space Lease. PSAF ¶ 26; R. 242-14, Exh. 24, June 26, 2008 Letter. Lakeview objected, reiterating its view that the deal was structured such that LaSalle would pay rent under the Existing Space Lease until Lakeview gave written notice to LaSalle that it was ready to develop the property. R, 273-3, Exh. 4, July 2008 emails.

In October 2008, Bank of America, N.A., and LaSalle Bank merged. DSOF ¶ 2. Following the merger, the Bank acquired LaSalle's obligations under the Existing Space Lease and Temporary Space Lease.[2] On November 26, 2008, Lakeview received a third extension of the maturity date of the Acquisition Loan from its lenders, extending the maturity date to January 15, 2009. DSOF ¶ 60. The first extension occurred on June 29, 2007, extending the maturity date to December 29, 2007; the second occurred on August 24, 2007, extending the maturity date of the

---

[2] The parties do not specifically address this point in their 56.1 filings. But this fact appears undisputed.

loan to June 26, 2008 and also increasing the principal amount of the loan by $2.5 million to $19.5 million. DSOF ¶¶ 32, 33.

On December 18, 2008, the Bank paid Lakeview $442,491.65 that Lakeview applied to the rent it claimed due under the Existing Space Lease. DSOF ¶ 61. With this payment, the rent under the Existing Space Lease was paid through October 2008. *Id.* In August 2010, the Bank—which up to this point had continued to occupy and pay rent on the Drive-Up Parcel, though it maintained it was acting pursuant to the Temporary Space Lease, not the Existing Space Lease—vacated the Drive-Up Parcel. DSOF ¶¶ 20, 59, 62.

In February 2010, Wells Fargo, Lakeview's lender, filed an action to foreclose on the property. DSOF ¶ 67. Wells Fargo and Lakeview negotiated a deed-in-lieu agreement, and in November 2011, Lakeview conveyed the property to Wells Fargo. DSOF ¶ 68. Under the deed-in-lieu agreement, Wells Fargo gave Lakeview a covenant not to sue, which effectively discharged Lakeview's debt on the property, approximately $20.4 million. DSOF ¶¶ 68, 69.

D.    **Procedural History**

Lakeview filed a single count complaint against the Bank in the Circuit Court of Cook County, Illinois. R. 1, Exh. A. The complaint sought a declaration that the Existing Space Lease had not terminated, and that under that lease, the Bank remained liable to pay rent and real estate taxes until such time as the lease was terminated. *Id.* The Bank removed the lawsuit to this Court on the basis of diversity jurisdiction. 28 U.S.C. §§ 1332, 1441. Before its reassignment to this

14

Court, R. 245, the case was originally assigned to Judge Manning, then briefly assigned to Judge Zagel, and then reassigned again to Judge St. Eve. R. 170, 184. It was reassigned to this Court on January 14, 2013. R. 245.

The Bank filed a Rule 12(b)(6) motion to dismiss the complaint, arguing, among other things, that it did not breach the Existing Space Lease because it lacked a definitive end date and was therefore either void or terminable at will. R. 12, 13. To support this argument, the Bank relied on *Say v. Smith*, 75 Eng. Rep. 410, 1 Plow. 269 (1563), a Sixteenth Century English case. Judge Manning rejected this argument and denied the Bank's motion. *Lakeview Collection, LLC v. Bank of America, N.A.*, 2009 WL 4674136, at *4 (N.D. Ill. Dec. 4. 2009). She further denied reconsideration and declined certification of the issue for an interlocutory appeal. R. 26, 44. Judge Manning stated that under Illinois law, "a lease is not void or terminable-at-will merely because it lacks a definite termination date but, rather, as with ordinary contracts, a lease that terminates upon the occurrence of an event is terminable upon the occurrence of the event, not at-will." *Lakeview Collection, LLC v. Bank of America, N.A.*, 2011 WL 976770, at *1 (N.D. Ill. Mar. 17, 2011) (discussing December 4, 2009 order). Judge Manning explained that under the terms of the Existing Space Lease, either condemnation or written notice from Lakeview to the Bank of an event of default could also trigger termination of the lease. *Lakeview*, 2009 WL 4674136, at *4. Accordingly, because the lease was terminable upon the occurrence of either of those events, it was not terminable at

will. *Id.* After Judge Manning denied its motion to dismiss, the Bank filed its answer to the complaint. R. 27, 52.

Lakeview then filed the amended complaint that governs this lawsuit. R. 62. The amended complaint re-alleged count I—seeking a declaration that the Existing Space Lease had not terminated—and added two additional breach of contract claims. *Id.* Count II, pled in the alternative to count I, alleges that the Existing Space Lease terminated, and the Bank breached the Temporary Space Lease by failing to pay rent. *Id.* Count III alleges that the Bank breached the Existing Space Lease by failing to pay rent, ultimately causing Lakeview to default on its mortgage and resulting in foreclosure, and accordingly, the Bank was liable to Lakeview for its reliance losses. *Id.*

The Bank moved to dismiss counts II and III of the amended complaint under Rule 12(b)(6), arguing that (1) dismissal of count II was warranted because Lakeview sought relief (money damages) when, if it was successful, it was only entitled to unpaid rent; and (2) it was entitled to dismissal of count III because at the time the parties executed the Existing Space Lease, foreclosure was not a reasonably foreseeable consequence of the Bank's failure to pay rent. R. 64. Judge Manning denied the motion, holding (1) as to count II, the Bank's challenge to the nature of relief sought by Lakeview did not warrant dismissal; and (2) as to count III, in light of Lakeview's well-pleaded allegations as to the reasonable foreseeability of foreclosure if the Bank failed to pay rent, the Bank's challenge failed. *Lakeview*, 2011 WL 976770, at *2-3. After the denial of its motion to dismiss,

16

the Bank filed it Answer and Affirmative Defenses, which it then amended twice. R. 94, 108, 156.

The Bank then moved to dismiss or for judgment on the pleadings. R. 172. Judge St. Eve—to whom the case had been reassigned—construed the motion as one for judgment on the pleadings under Rule 12(c). The Bank argued that the parties never formed a valid lease for a term of years, and therefore the lease was terminable at will. The Bank claimed that the duration of the Existing Space Lease was indefinite and uncertain because the lease did not specify a date by which Lakeview must issue the written notice of termination. Consequently, the Bank argued, because the lease was terminable at will, it could not have breached the lease by vacating the Main Parcel. The Bank again relied on *Say*, arguing that it supported the Bank's claim that where a lease for years does not have a definite end date, an agreement for that lease of years is not valid but is merely a tenancy at will. Judge St. Eve rejected this argument, holding that as a matter of law, "the Existing Space Lease is not indefinite in duration, and therefore is not terminable at will." *Lakeview Collection, LLC v. Bank of America, N.A.*, 2012 WL 4852994, at *8 (N.D. Ill. Oct. 11, 2012). Rather, "[r]eading the lease as a whole, it is clear that the parties intended the lease to be of a limited and reasonably certain duration to effectuate the parties' contractual purpose: to allow [the Bank] to maintain its operations on the Main Parcel until [Lakeview] begins demolition and construction on the Main Parcel, at which time [the Bank] would relocate to a temporary bank location and eventually to the redeveloped property." *Id.*

Pointing to specific termination events in the Existing Space Lease—which included circumstances relating to redevelopment, condemnation, default, notice of intent to demolish the Main Parcel and begin construction on the redevelopment project—recitals in the Existing Space Lease, and the "nature of the overall real estate transaction, including the terms of other simultaneous agreements," Judge St. Eve concluded that the parties intended to be bound for a limited and reasonably certain duration. *Id.* She reasoned that "[a]lthough the contract does not provide a specific end date, the parties reasonably expected that the development project would occur in the near term." *Id.* at *9. The Bank now moves for summary judgment on counts I and III.

## Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the non-movant, to avoid summary judgment, must present facts to show a genuine dispute exists. *Id.* at 323-24. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012) (internal quotation marks omitted). In other words, to establish a genuine issue of material fact, the non-moving party "must do more than show that there is some

18

metaphysical doubt as to the material facts." *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Indeed, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (internal quotation marks omitted).

In deciding a motion for summary judgment, the court reviews the record in the light most favorable to the non-moving party, "resolving all evidentiary conflicts in [its] favor and according [that party] the benefit of all reasonable inferences that may be drawn from the record." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The existence of a materially disputed issue of fact will be sufficient to avoid summary judgment only if the disputed fact is determinative of the outcome under the applicable law. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

At issue in this case is the interpretation of the parties' agreements, namely, the Purchase Agreement and the Existing Space Lease.[3] The rules of contract interpretation are well settled. Under Illinois law, which applies in this diversity

---

[3] Under Illinois law, "[t]he rules adopted for interpreting a lease are the same rules used to interpret a contract." *Clarendon Am. Ins. Co. v. Prime Group Realty Servs., Inc.*, 389 Ill.App.3d 724, 729 (1st Dist. 2009).

action, the primary objective in construing a contract is to give effect to the intent of the parties. *Gallagher v. Lenart*, 226 Ill.2d 208, 232 (2007). The language of the contract, "given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* at 233. "[A] contract must be construed as a whole, viewing each part in light of the others." *Id.* This means that the intent of the parties may not be "gathered from detached portions of a contract or from any other clause or provision standing by itself." *Id.* "[I]nstruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as one contract and will be construed together." *Id.*

The court first asks if the contract language is ambiguous, a question of law. *Lewitton v. ITA Software, Inc.,* 585 F.3d 377, 379 (7th Cir. 2009). If the language of a contract is unambiguous, it will be given its plain and ordinary meaning and enforced as written, without reference to extrinsic evidence. *Harmon v. Gordon*, No. 11-3176, — F.3d —, 2013 WL 1150204, at *4 (7th Cir. Mar. 21, 2013) (citing *Thompson v. Gordon*, 241 Ill.2d 428, 441 (2011)). Where the language of a contract is susceptible to more than one meaning, however, it is ambiguous, and a court may then consider extrinsic evidence to ascertain the parties' intent. *Gallagher*, 226 Ill.2d at 233. That the parties disagree on the interpretation of a contract's language does not automatically render that contract ambiguous. *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (interpreting Illinois law). Rather, "[t]he question of contract ambiguity turns largely on whether the contract language is "reasonably susceptible to more than one meaning." *Id.* (internal quotation marks omitted). If it

is, then extrinsic evidence may be considered to ascertain what the parties intended. *Gallagher*, 226 Ill.2d at 233.

## Analysis

### I.    The Bank's Motion to Strike

At the outset, the Court addresses the Bank's motion to strike. The Bank seeks to strike: (1) Lakeview's Supplemental Answer to Interrogatory No. 6; (2) Lakeview's response to paragraph 64 of the Bank's Statement of Facts; and (3) paragraphs 4, 9, 30, 31, and 32 of Lakeview's Statement of Additional Facts. Lakeview opposes the motion in its entirety. For the following reasons, the Bank's motion to strike is denied subject to being revisited in a voir dire of Lakeview witnesses on the specific subject of the project discussed below to determine whether the testimony has a proper foundation and is reliable or is impermissibly speculative.

#### A.    Supplemental Answer

The Bank moves to strike Lakeview's Supplemental Answer to Interrogatory No. 6, arguing that the answer is contradictory to a previous response Lakeview made to the Bank's contention interrogatory. The Bank asked:

> Do you contend that [y]ou would have been unable to obtain financing to construct the Redevelopment Project and/or secure the financing necessary to perform Lakeview's obligations under the Purchase Agreement but for the Bank's alleged breach of the Existing Space Lease? If so, identify each and every fact, and all documents, relating to and/or supporting such contention.

R. 282-1 at 4. Lakeview's April 12, 2011 response stated:

> Lakeview is unaware if any prospective construction lender would have provided construction financing had the Bank not breached the Existing Space Lease.

*Id.* The answer does not indicate that Lakeview would not have been able to obtain financing even if the Bank had honored its Existing Space Lease obligations. In its March 29, 2013 supplemental answer to the Bank's interrogatory, Lakeview stated:

> Yes. While the prior interrogatory response dated April 12, 2011 accurately stated that Lakeview was unaware if any prospective construction lender would have provided construction financing if the Bank had not breached the Existing Space Lease as of that date, as Sol Barket explained in his July 19, 2011 deposition, had the Bank continued to make payments under the Existing Space Lease, Lakeview would not have gone into default with Wells Fargo and ultimately would have been able to obtain construction financing when markets improved. As of July 19, 2011, Mr. Barket and Lakeview were unsure when the market would sufficiently rebound. But by that time, projects had begun to start being financed.

*Id.* at 9-10 (deposition citations omitted). The answer added that the "market has shown substantial improvement since that time and projects are starting to be financed." *Id.* at 10. Moreover:

> The recent purchase of this property for development [by Target] confirms that the market has substantially rebounded, that the market continues to rebound and that Lakeview would have been in a position to obtain construction financing for the project if the Bank had not caused Lakeview to default on its mortgage with Wells Fargo by breaching its obligations to pay rent to Lakeview under the Existing Space Lease.

*Id.*

The Bank indicates that it was surprised by the content of Lakeview's supplemental answer, but as Lakeview points out, Sol Barket testified as to the rebounding nature of the market in his deposition in July 2011. The Bank therefore had fair notice of Lakeview's defense that it believed it could obtain construction

financing. The updated answer simply reaffirmed Barket's testimony and noted changes that had occurred since the response was first issued.

The Bank further argues that the supplemental answer cannot be used by Lakeview for summary judgment purposes because the information in the answer is not based on personal knowledge. Federal Rule of Civil Procedure 56(c) allows a court to consider answers to interrogatories "so long as the content of those interrogatories would be admissible at trial." *Johnson v. Holder*, 700 F.3d 979, 982 (7th Cir. 2012) (internal quotation marks omitted). "Simply stated, a person answering an interrogatory can testify competently at trial to the information contained in [his] answers so long as [he] has personal knowledge of such information." *Id.* The supplemental answer relied on Barket's deposition testimony, which the Court finds, along with the other challenged testimony relating to Lakeview's attempts to secure financing, appears to be based on personal knowledge and is admissible under Rule 701 of the Federal Rules of Evidence as an opinion rationally based on the witness' perception, is helpful to determining a fact in issue, and is not based on specialized knowledge within the scope of Rule 702. Accordingly, the Bank's motion to strike the supplemental answer is denied. The Court will allow voir dire of Barket on this point and will revisit it before allowing his testimony to be heard by the fact-finder.

**B.     Lakeview's Response to Paragraph 64 of the Bank's Statement of Facts and Paragraphs 30, 31, and 32 of Lakeview's Statement of Additional Facts**

The Bank moves to strike Lakeview's response to paragraph 64 of the Bank's Statement of Facts and paragraphs 30, 31, and 32 of Lakeview's Statement of Additional Facts. For the same reasons as noted above regarding the Bank's challenge to Lakeview's supplemental answer to the Bank's interrogatory, the Court denies the Bank's motion to strike these paragraphs.

**C.     Paragraphs 4 and 9 of Lakeview's Statement of Additional Facts**

Finally, the Bank moves to strike paragraphs 4 and 9 of Lakeview's Statement of Additional Facts, arguing that the support for them, namely John McLinden's deposition testimony, is improper expert testimony. The Court disagrees and finds that McLinden's testimony is lay, not expert, opinion testimony and that he provided adequate support for his lay opinion. Accordingly, the Court denies the Bank's motion to strike these paragraphs. Again, this issue will be revisited at trial and a voir dire of McLinden will be conducted before he is allowed to testify to this opinion before a fact-finder.

**II.     Count I**

Count I of Lakeview's amended complaint seeks a declaration that the Existing Space Lease has not terminated and that the Bank is obligated to continue to pay rent under that lease. Judge St. Eve previously determined that the term of the Existing Space Lease is not "indefinite in duration, and therefore is not terminable at will." *Lakeview*, 2012 WL 4852994, at *8. Most importantly, Judge St.

Eve concluded that "[r]eading the lease as a whole, it is clear that the parties intended the lease to be of a limited and reasonably certain duration to effectuate the parties' contractual purpose: to allow [the Bank] to maintain its operations on the Main Parcel until [Lakeview] begins demolition and construction on the Main Parcel, at which time [the Bank] would relocate to a temporary bank location and eventually to the redeveloped property." *Id.* Although noting that the lease was intended to be of a limited and reasonably certain duration, Judge St. Eve did not determine the lease's duration and its termination date. That is the question currently before the Court.

The parties dispute the date. The Bank argues that under the Existing Space Lease, the lease terminated on May 31, 2008[4] because at that time (1) Lakeview had obtained zoning approval for the Complex (done in May 2007); and (2) Lakeview had terminated the Option Parcel Third Party leases (done in June 2007). Thus, the only outstanding action, says the Bank, was the relocation of the Bank's operations from the Main Parcel. According to the Bank, once it relocated on May 4, 2008, "the intended contractual purpose" of the Existing Space Lease was satisfied, and the lease terminated under section 3(b) of the Existing Space Lease, thereby relieving the Bank of its obligation to pay rent. R. 258 at 11. Accordingly, the Bank argued that it supposedly did not breach the Existing Space Lease when it vacated the Main Parcel in May 2008..

---

[4] At the April 18, 2013 hearing held on the Bank's motions for summary judgment, the Bank suggested that June 6, 2008—the date that the last of the option parcel tenants left the property—was an alternative termination date.

Lakeview disagrees, arguing that the Existing Space Lease did not terminate in May 2008 because at that time, it had not yet obtained construction financing for redevelopment of the Main Parcel and accordingly had not yet provided written notice of demolition and commencement of construction to the Bank. Only then— when it obtained construction financing for the Complex and sent written notice— Lakeview says, would the lease have terminated.[5] Because of the 2008 market crisis, however, Lakeview had not yet secured construction financing and was unable to begin demolition of the existing structures on the Main Parcel and construction of the Complex. Lakeview maintains that the parties had explicitly contemplated this scenario—the inability to develop the Complex on the Main Parcel—and that section R-9(d) of the Rider to the Purchase Agreement is the best indicator of the parties' intent on what would happen if construction did not occur. That section, according to Lakeview, specifically gave the Bank the option of terminating the Temporary Space Lease and the Branch Lease—notably not the Existing Space Lease—if the Outside Date requirements for development of the Complex were not met. Thus, R-9(d) contemplates that the Existing Space Lease and the Bank's obligations under that lease would continue even if Lakeview were unable to commence with construction on the Complex.

---

[5] The Court draws this conclusion from page 19 of Lakeview's response to the Bank's partial motion for summary judgment: "The parties here could always contemplate the end of the Lease, whether by construction financing, by the lenders' repeated extensions of the Maturity Dates, or by the lenders' exercise of their rights as creditor." R. 278 at 20 (emphasis omitted).

For the reasons that follow, the Court finds that the language of the agreements between the parties is susceptible to more than one reasonable interpretation and is therefore ambiguous. Further, looking to extrinsic evidence to ascertain the parties' intent, the Court finds that a genuine issue of material fact exists as to the duration of the Existing Space Lease, precluding summary judgment on count I.

### A.    Mend the Hold Doctrine

Before discussing its interpretation of the language of the various agreements, Lakeview requests that the Court apply the "mend the hold" doctrine and bar the Bank from arguing that the Existing Space Lease terminated in May 2008. Lakeview looks to the Bank's previous argument in the litigation where the Bank argued on multiple occasions that the Existing Space Lease lacked a definitive end date and was terminable at will. Lakeview compares that position to the Bank's current argument in its summary judgment motions where the Bank now gives the lease a specific termination date, May 31, 2008. Lakeview asserts that the Bank's about-face should preclude consideration of the Bank's arguments on the merits.

To be sure, the Bank has abandoned its previous argument (indeed, one that was asserted and properly rejected on four separate occasions in this litigation, *Lakeview*, 2012 WL 4852994, at *1 n. 1), that the Existing Space Lease was terminable at will. Now, as Lakeview points out, the Bank has assigned the Existing Space Lease a specific termination date. (Even now, though, at the April

27

18, 2013 hearing, the Bank has changed its position on the precise termination date, identifying June 6, 2008 as an applicable termination date).

The mend the hold doctrine, which Illinois applies, restricts the defendant in a breach of contract lawsuit from changing its defenses, "at least without a good reason to do so," in the middle of a suit. *Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 614 (7th Cir. 2012); *see also Larson v. Johnson*, 1 Ill.App.2d 36, 46 (1st Dist. 1953). The party invoking the doctrine must suffer prejudice for the doctrine to bar a defense. *Ryerson*, 676 F.3d at 614; *see also Trossman v. Philipsborn*, 373 Ill.App.3d 1020, 1043-44 (1st Dist. 2007) (application of the doctrine limited to situations where party can demonstrate detriment, unfair surprise or arbitrariness). The doctrine is an equitable one, "seen as a corollary of the duty of good faith" that Illinois "imposes on the parties to contracts." *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990); *see also Larson*, 1 Ill.App.3d at 46 (describing development of doctrine as means to redress unfair and arbitrary conduct of repudiating party). Of particular concern is when a party changes its position not "on the basis of further inquiry through pretrial discovery or otherwise but only because the district court threw cold water on [its] argument." *Harbor*, 922 F.2d at 365.

A fairly strong argument has been made that the mend the hold doctrine may apply given the Bank's contrary stances taken during the course of the litigation, but under the particular facts of this case, the Court declines to apply the doctrine here. The Illinois Supreme Court has not definitively held that the expenditure of

fees and costs, which Lakeview argues was the detriment it suffered, to defend an action where a party has appeared to have changed its position mid-suit alone constitutes sufficient prejudice or detriment to completely bar a new defense.[6] Lakeview has further not specifically identified in its response to the Bank's summary judgment motion how the Bank's change in defense constitutes unfair surprise or arbitrariness for the mend the hold doctrine to apply. R. 278 at 14-15. Accordingly, under the particular facts of this case, the Court finds that the mend the hold doctrine does not apply and will proceed to the merits of the parties' arguments.

### B. Interpretation of the Agreements

#### 1. Whether the plain language of the agreements is ambiguous

On the merits, the Court begins with the first step of contract interpretation—a determination of whether the language of the contract is ambiguous. This case turns on the interpretation of four different provisions of the Purchase Agreement and the Existing Space Lease and the application and interplay of a number of well-settled principles of contract interpretation. Each side relies on different provisions of the agreements, arguing that those provisions support their proposed termination date for the Existing Space Lease, and different

---

[6] *Townsend v. Postal Benefit Ass'n of Ill.*, 262 Ill.App. 483, 488 (4th Dist. 1931) stated that a party "will not be permitted, after costs and expenses have been incurred in prosecuting the action, to mend its hold and set up other defenses, even though at the outset such other defenses may have been available." But the Illinois Supreme Court has not spoken on this aspect of the doctrine in the 80 years since *Townsend*.

principles of contract interpretation. Each side claims that their respective principles mandate a finding of unambiguity—and therefore the grant of summary judgment—or ambiguity—and therefore the existence of a genuine issue of material fact, precluding the grant of summary judgment.

Beginning with the Bank: the Bank relies on sections 2 and 3(b) of the Existing Space Lease and section R-9(c) of the Rider to the Purchase Agreement. According to the Bank, the Court need only look to the language of these sections, which unambiguously demonstrate that the Existing Space Lease terminated when the specific events listed in section 3(b) occurred in May 2008. Because the language of section 3(b) unambiguously establishes the length of the term of the lease, the Bank argues that referring to extrinsic evidence to ascertain the parties' intent is unnecessary. Anticipating Lakeview's argument that the Bank's obligation to pay rent under the Existing Space Lease did not terminate until Lakeview obtained construction financing, the Bank argues that nothing in the various agreements allow for this interpretation. In fact, the Bank argues that section R-9(c) of the Rider refutes Lakeview's contention because that section specifically exempts the inability to obtain funds as a reason to extend the deadlines in R-9(c)'s redevelopment timeline. The Bank adds that section R-9(d), on which Lakeview relies, does not create an ambiguity as to the termination date for that section "merely provides the Bank with an 'out' from the Temporary Space Lease and the Retail Branch Lease in the event construction was significantly delayed, even if the delay was justifiable on account of 'Force Majeure or any other events.'" R. 280 at

10. In other words, the Bank interprets section R-9(d) merely to say that the Bank could not terminate the Existing Space Lease if the delays were caused by Force Majeure. Because Force Majeure was not a reason that demolition and construction were delayed, R-9(d) is irrelevant.

Lakeview, on the other hand, interprets section R-9(d) differently, believing that section best implements the intent of the parties as established by the Court in its prior order, or at the very least creates a genuine issue of material fact as to the parties' intent regarding the duration of the lease.[7] According to Lakeview, section R-9(c) is not dispositive as the Bank suggests because that section merely establishes aspirational deadline dates. Indeed, the language requires that Lakeview "endeavor" to perform certain actions. Lakeview claims that section does not provide any consequence should Lakeview fail to comply with any of the specified dates in R-9(c). But section R-9(d), Lakeview argues, does exactly that: it states that a failure to comply with the Outside Date Requirements shall constitute a material delay—regardless of Force Majeure—and then provides an exclusive remedy for the Bank should Lakeview fail to comply. That remedy was to terminate the Temporary Space Lease and Branch Lease, not the Existing Space Lease. The absence of the option to terminate the Existing Space Lease is significant, Lakeview claims, because it evidences the parties' intent for the Bank to continue paying rent under the Existing Space Lease if construction were delayed for any reason.

---

[7] Lakeview does not specifically argue that section R-9(d) makes the language of the lease ambiguous, creating a question of fact for trial. But the Court infers this to be Lakeview's argument.

31

As for sections 2 and 3(b), Lakeview argues these sections do not carry the day in light of Judge St. Eve's prior order. In that order, Judge St. Eve stated:

> Beginning with the plain language of the lease, the lease sets up numerous specific termination events. Perhaps most notably, Section 2 contemplates that [Lakeview] will issue a notice of intent to demolish the Main Parcel and begin construction on the redevelopment project. If [Lakeview] does so before August 31, 2006, the lease shall not terminate until that date. But in all circumstances, Section 3 extends the termination date under certain circumstances, including where [the Bank] has not yet relocated to the temporary location or where other non-party tenants have not yet vacated.

*Lakeview*, 2012 WL 4852994, at *8. Lakeview contends that in allowing the Bank to extend the lease term for the reasons articulated in section 3(b), the section cannot be construed to allow the Bank to unilaterally terminate the lease when it has relocated its business operations to a temporary branch.

With the purpose of the agreements identified by Judge St. Eve and her interpretation of section 3(b) of the Existing Space Lease in mind and reading the plain language of all the cited provisions together, the Court finds the language of the agreements to be ultimately ambiguous. The language of the Existing Space Lease is silent on the exact termination date. And none of the provisions the parties rely on unambiguously set one. Rather, the various provisions the parties cite in support of their interpretation of the duration of the lease are unclear, internally inconsistent, and susceptible to more than one reasonable and equally compelling interpretation. Examining section 2, it provides, in relevant part, that the lease term shall terminate 120 days after Lakeview provides written notice to the Bank that Lakeview intends to demolish the structures on the Main Parcel and commence

32

construction, "in any event subject to the terms in Section 3(b) below." Section 3, in turn, provides "notwithstanding the foregoing, in the event that and for so long as" the option parcel third party tenants remain in possession after the expiration date or the Bank has not relocated to a temporary branch space, then the lease "shall remain in full force and effect" and the Bank will continue to pay rent under the lease until such as the last of the tenants vacate the property and the Bank relocates. Because section 2 explicitly refers to the "terms in Section 3(b) below," it is reasonable to interpret the "[n]otwithstanding the foregoing" language in section 3(b) as overlapping with the dates referenced in section 2(b). In other words, as Judge St. Eve concluded, it is equally reasonable to interpret section 3(b), not as setting forth a termination date for the lease, but rather as setting forth an extension date of the lease in the event that Lakeview provides written notice of demolition and commencement of construction but the Bank had not yet relocated its business operations to a temporary branch space.

Ultimately, selecting one of the parties' proposed termination dates would require the Court to go beyond the plain language of the agreements. Because these provisions create an ambiguity as to the parties' intent, the Court must examine the extrinsic evidence in the record to ascertain the parties' intent regarding the duration of the lease.

### 2. Whether resorting to extrinsic evidence creates a question of fact

"Under Illinois law, when a court decides that a contract is ambiguous, its interpretation generally becomes a question of fact for the jury." *Harmon*, 2013 WL

1150204, at *4. But if "the extrinsic evidence bearing on the interpretation is undisputed, the construction of the ambiguous contract is a question of law for the court." *Id.* (internal quotation marks omitted). The court may therefore grant summary judgment if no reasonable jury could find for the plaintiff "even when all reasonable inferences are drawn from the undisputed extrinsic evidence." *Cont'l Cas. Co. v. Nw. Nat'l. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

"When no termination date is specified in a contract, courts must look to surrounding circumstances to discover the intention of the parties." *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1012 (7th Cir. 1985) (citing *Adkisson v. Ozment*, 55 Ill.App.3d 108, 112 (5th Dist. 1977)). Under Illinois law, "'[a] contract may be construed to continue until the happening of a specific event, if that appears to have been the intention of the parties." *Id.* (quoting *Ricke v. Ricke*, 83 Ill.App.3d 1115, 1120 (2d Dist. 1980)); *see also Consol. Labs., Inc. v. Shandon Scientific Co, Ltd.*, 413 F.2d 208, 212 (7th Cir. 1969) ("[A] contract which is terminable upon the occurrence of an event is not terminable at will, but is . . . to be enforced according to its terms and the reasonable implication thereof.") (internal quotation marks omitted).

Moreover, "[i]nterpreting contracts so that major clauses fall out usually is not a sensible way to understand the parties' transaction." *Baldwin Piano, Inc. v. Deutsche Wurlitzer GMBH*, 392 F.3d 881, 883 (7th Cir. 2004). Indeed, provisions of a contract shall not be interpreted in a manner that would "nullify or render provisions meaningless." *Thompson*, 241 Ill.2d at 442. "When there is a choice

among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided."[8] *Baldwin Piano*, 392 F.3d at 883.

The Bank and Lakeview disagree as to their intent regarding the duration of the Existing Space Lease. The Bank argues that the parties never intended for the Bank to pay rent under the Existing Space Lease once the conditions in section 3(b) had occurred, and Lakeview's proposed termination date would extend the lease "far beyond the period necessary to accomplish its contractual purpose." R. 258 at 13. The Bank asserts that section R-9(c), which expressly excludes a "lack of funds" as a basis for Force Majeure or as an excuse to delay Lakeview's obligations to demolish the existing structures, establishes that it never agreed to pay rent until Lakeview obtained construction funding. The Bank further points to the following

---

[8] Under Illinois law, the doctrine of *contra proferentem* requires that ambiguities in the terms of a contract are construed against the drafter. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 479 (1998). It is unclear from the record who drafted the agreements at issue. The parties agree that both sides were represented by counsel at the time but appear to dispute who the actual drafter was. At the April 18, 2013 hearing, the Bank indicated that both sides drafted the agreement and exchanged drafts, while Lakeview indicated that the Bank drafted the documents. The Bank in its most recent motion to cite additional authority argues that Lakeview's counsel drafted the lease. R. 312 at 3. Where both sides participated in the drafting of the contract, Illinois courts have declined to apply *contra proferentem. Tranzact Techs., Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 546 n. 2 (7th Cir. 2004). Moreover, Illinois resorts to this doctrine only if ordinary principles of contract interpretation fail to ascertain the intent of the parties. *Premier Title Co. v. Donahue*, 328 Ill.App.3d 161, 166 (2d Dist. 2002) (describing the rule as "at best a secondary rule of interpretation, a last resort which may be invoked after all the ordinary interpretive guidelines have been exhausted") (internal quotation marks omitted). Because the answer to this question is not entirely clear and the intent of the parties can be ascertained using other principles of contract interpretation, the Court declines to apply the doctrine here.

extrinsic evidence, which it says favors its version of the intended purpose of the lease: (1) the deposition testimony of Kelly Stradinger, the Bank's head of corporate real estate, which establishes this intent, R. 243-12 at 34; (2) the deposition testimony of Valeria Bailey, the Bank's attorney who negotiated the Existing Space Lease, which also establishes this intent, R. 243-11 at 24-28; (3) Lakeview's adjustment of its pro forma to account for the fact that the Bank would not be paying rent under the Existing Space Lease after the Bank vacated; and (4) the deposition testimony of John McLinden, a Lakeview principal involved in the negotiations, that the property could not be sold or developed at its "current basis" of "$22 million plus" because of "financing conditions," DSOF ¶ 63.

The extrinsic evidence Lakeview points to, however, reasonably demonstrates a different intent—that the Bank was to pay rent under the Existing Space Lease (or the carrying cost of the Main Parcel) until Lakeview obtained construction financing: (1) Stradinger's deposition testimony regarding the purpose of the carrying costs of the Main Parcel and what would happen if construction on the Main Parcel did not occur, PSAF ¶¶ 9, 12; (2) McLinden's deposition testimony regarding the purpose of the carrying costs of the Main Parcel, PSAF ¶¶ 9, 17; (3) Sol Barket's deposition testimony regarding the intent of the lease agreement; PSAF ¶16; (4) prior drafts of section R-9(d), R. 302-4 at 14, Exh. C; and (5) email exchanges as to why section 3(b) was inserted into the Existing Space Lease. This record evidence, according to Lakeview, and its interpretation of the parties' agreements as to the termination event, best reconciles any conflict between section

3 of the Existing Space Lease and sections R-9(c) and R-9(d) of the Rider. Lakeview further contends that this interpretation makes the most commercial sense given the circumstances and nature of the overall transaction.

With these principles in mind, the Court has carefully reviewed the extrinsic evidence in the record marshaled by both sides. Considering the entirety of the agreements as a whole and the nature and circumstances of the overall transaction, the Court finds that a genuine issue of material fact exists as to the parties' intent regarding the duration of the Existing Space Lease, precluding the grant of summary judgment. At this stage, the trier of fact could reasonably find that the parties intended for the lease to continue until Lakeview could obtain construction financing, or was at least attempting to obtain it. Indeed, a finder of fact could reasonably find that the parties made a specific bargain—Lakeview agreed to close the deal early to accommodate LaSalle and allow it to book a substantial profit before the year's end; but in exchange, the Bank had to pay the carry costs of the Main Parcel while Lakeview pursued, in good faith, demolition and construction of the Complex. In fact, a trier of fact could reasonably conclude that the reason that Lakeview agreed to the deal (and the only way the deal makes financial sense for Lakeview) was because the Bank agreed to pay the carry costs of the Main Parcel while it pursued demolition and construction.

The deposition testimony of Stradinger, Barket, and McLinden reasonably supports this construction of the parties' intent. PSAF ¶¶ 9, 16. Stradinger testified (testimony the Bank does not dispute) as to the purpose of the deal:

37

> Q:      Do you recall that Lakeview Collection agreed to close prior to the end of 2005 to accommodate LaSalle Bank provided LaSalle Bank paid the carry on the parcels?
>
> A:      Yes.

PSAF ¶ 9. Stradinger further testified that the "rent" LaSalle would pay was designed to cover the carry costs on the property. PSAF ¶ 12 ("[O]ne of the factors in determining the rent that we paid was the purchase price of the property and what would it cost the landlord to carry that property. But when we put it into the lease, we termed it rent because it's rent on a space we are leasing."). Barket's and McLinden's testimony confirmed Lakeview's understanding of the deal:

> That's the premise of the whole deal, was that they're paying rent until we can put a shovel in the ground. So that protected us so that we didn't have any undue carry costs. So long as we couldn't develop the property, they were paying rent—under the lease.

PSAF ¶ 9 (McLinden's testimony); PSAF ¶ 17 (McLinden testifying "part of our deal was, we closed the property early, they gave us a lease so that until we were ready to put a shovel in the ground . . . they continued to pay rent under their lease; so effectively, at least with respect to the carry cost, that portion of the risk was there [with the Bank]"); *see also* PSAF ¶ 16 (Barket testifying: "We bought this property with no entitlements, and the intention was that the only way we could do so is with the—with the lease that would not expire until such time as we got the entitlements and we got the approvals to construct.").

A trier of fact could also reasonably determine that the record evidence demonstrates that the parties considered the possibility that the Existing Space Lease might continue for a lengthy period of time. Barket's testimony established

this. PSAF ¶ 15 ("Could this go on for a lengthy period of time? It was definitely discussed."). Stradinger also addressed the concerns surrounding R-9(d) (again, testimony the Bank does not dispute) in his deposition testimony. When asked if there was ever a discussion about what would happen if construction on the Main Parcel did not occur, Stradinger answered: "We had discussed that the permanent lease [the retail bank branch lease] would have to have a provision that wouldn't make it go on forever or—there had to be a provision in the leases that allowed us to unwind the planned activities if the project didn't go forward." PSAF ¶ 13.

Moreover, the prior draft of section R-9(d)—that the Bank specifically did not adopt—would have given it a right to terminate the Existing Space Lease, as well as the Temporary Space Lease and Retail Branch Bank Lease, if development timelines were not met.[9] R. 302-4 at 14, Exh. C, Redline Draft of Real Estate Agreement. This additional evidence would allow a trier of fact to determine that the parties contemplated that the Existing Space Lease might extend past May 31, 2008, and indeed, for a longer period of time.

Also of significance—undercutting the Bank's position that the timeline dates identified in R-9(c) were firm deadlines and a fact on which a reasonable fact-finder could conclude that the Bank did not believe its rent obligations under the Existing Space Lease had ended as of May 2008—is the Bank's December 18, 2008 payment

---

[9] The prior draft also provided the Bank with a "Repurchase Option" remedy for any material delay. R. 302-14 at 14. That option would require the Bank to repurchase the property from Lakeview at the purchase price Lakeview paid and to pay Lakeview an additional $1,000,000 to cover its expenses. *Id.*

of $442,491.65. DSOF ¶ 61. Although the Bank argued at the April 18th hearing that is unfair to use that payment against the Bank since it was an attempt by the Bank to settle the dispute at the time, the Court notes that the payment was apparently not made with any caveat that the payment was not to be construed against the Bank, or was to be inadmissible under Federal Rule of Evidence 408.[10]

The Bank counters that under Lakeview's construction, the lease would necessarily have to continue until the market rebounded to allow for construction financing, which would not be reasonable "since during [the] depths of the recession, no one knew or could predict when the real estate market would eventually recover." R. 280 at 2. Moreover, R-9(c)'s milestone dates refute Lakeview's argument that the Bank intended for the lease to continue until Lakeview obtained construction financing since those dates—which contemplated the commencement of demolition by February 28, 2007 and construction 20 days after building permits were obtained on April 2, 2007—would not be delayed on account of "lack of funds." Also, according to the Bank, McLinden's deposition testimony established that the project could never have been financed at its basis of "$22 million plus." R. 312 at 3.

Lakeview, however, argues that had the Bank honored its rent obligation under the Existing Space Lease, it ultimately would have been able to obtain construction financing because by July 2011, projects had started to be financed again. PSAF ¶¶ 31, 32. The testimony of McLinden weighs in favor of the Bank on

---

[10] There was no evidence in the Bank's Local Rule 56.1(a)(3) statement of facts that this was the case. If evidence that the December 2008 payment is inadmissible under Rule 408 is provided at trial, however, the Bank may move to bar its admission.

this point, but even accounting for that testimony, a genuine issue of material fact exists given all of the other evidence pointed to by Lakeview in support of its construction of the intent of the duration of the lease. Moreover, to the extent there is a conflict between sections R-9(c) and R-9(d), a fact-finder could determine that R-9(d) trumps R-9(c) and find the dates in the redevelopment timeline to be aspirational given the history of the relationship between the parties up to that point where deadlines in R-9(c) passed with no consequence.

Additionally, interpreting the lease to terminate when Lakeview obtains construction financing is not unreasonable, as the Bank contends. A trier of fact could conclude that this event was an action that the parties reasonably expected to occur in the foreseeable future. That this event was overdue because of a superseding market collapse does not mean that the contract was of an impermissibly indefinite duration. The lease was meant to last only for such time as was reasonably necessary to obtain construction financing, so long as Lakeview can establish—and which a fact-finder may reasonably determine—that it was pursuing construction financing on a good-faith basis. *See Consolidated Labs.*, 413 F.2d at 212 (contract "to be enforced according to its terms and reasonable implication thereof"); *see also id.* ("Mere unanticipated difficulty, inconvenience, unexpected expense, loss, or improvidence will not excuse failure to perform a contract according to its terms."); *cf. E.J. Brach Corp. v. Gilbert Int'l, Inc.*, No. 90 C 1399, 1991 WL 148914, at *3 (N.D. Ill. June 18, 1991) ("[C]onsidering the contract as a whole, if a period of duration can fairly and reasonably be implied, it will be

enforced . . . . What the reasonable length of duration may be is a question for the trier of fact."). Although R-9(c) provided milestone dates by which certain events were to occur, a genuine issue of fact exists as to whether these deadlines were merely aspirational so long as Lakeview endeavored to perform those actions or whether they were events that would put Lakeview in default of the Existing Space Lease if Lakeview did not comply with them. Indeed, testimony from Mary Koberstein, Centrum Properties' general counsel, supports the view that the dates were merely aspirational. R. 302-3 at 6-7 (Koberstein testifying "[Lakeview] obligated itself to endeavor to [obtain zoning and access, prepare plans and commence and complete construction] but it wasn't in default if it didn't get them accomplished by the deadlines").

As for section 3(b) of the Existing Space Lease, Lakeview points to evidence that demonstrates that the provisions in section 3(b) were inserted at the request of the Bank to ensure that the Existing Space Lease would not terminate in the event that notice of demolition was given to the Bank but the Bank had not yet relocated its business operations. PSAF ¶ 10. The Bank indicated that even if the expiration date under section 2 occurred, the Bank wanted the lease to continue in effect "for its own protection for regulatory reasons." *Id.* And although Lakeview adjusted its pro forma to account for the fact that the Bank would not be paying rent under the Existing Space Lease after the Bank vacated, Lakeview counters that the change was done simply to reflect the fact that rent would not be paid. R. 260 at 39. Lakeview argues that the change was not, as the Bank contends, an indication that

42

Lakeview intended for the lease to end in May 2008 when the Bank vacated. A fact-finder could reasonably credit this explanation.

Ultimately, the Existing Space Lease is silent as to an exact termination date: it does not specifically set forth an event upon which the lease may be terminated. But the circumstances surrounding the transaction and the nature of the parties' agreement indicate the parties' intent to create a relationship terminable when Lakeview obtained construction financing. At the very least, a trier of fact could fairly imply from the nature of the commercial relationship between Lakeview and the Bank that the parties intended the term of the lease to expire when Lakeview obtained construction financing. Where, as here, there is more than one reasonable way to read the parties' agreements and the extrinsic evidence is disputed and allows a reasonable fact-finder to find for the non-movant, summary judgment cannot be granted. Because a genuine issue of material fact exists as to the intent of the parties on the duration of the lease, that precludes the grant of summary judgment on count I.

## III.    Count III

The Bank also seeks summary judgment on count III of Lakeview's amended complaint. In count III, Lakeview seeks "lost equity" or reliance damages resulting from Wells Fargo's (its lender's) foreclosure action against the property.[11] The Bank

---

[11]  On December 17, 2012, Judge St. Eve granted the Bank leave to file a partial summary judgment motion limited to the issue of whether Lakeview is entitled to recover lost equity consequential damages. R. 235. Judge St. Eve reserved the question of whether the Bank's partial summary judgment motion might improperly partition a single claim for relief into constituent parts, indicating she

argues that even if there are genuine issues of triable fact as to whether it breached the Existing Space Lease, summary judgment in its favor is proper because (1) Lakeview's losses were not a foreseeable consequence of the Bank's breach at the time the parties executed the Existing Space Lease; and alternatively (2) there is no reasonable basis for Lakeview's calculation of its reliance damages.

## A.    Foreseeability

The Bank's argument on count III is twofold. First, the Bank argues that even if it breached the Existing Space Lease, that breach was not the cause in fact of Lakeview's loss. Rather, the cause in fact of Lakeview's loss was "the worst recession since the Great Depression and [Lakeview's] inability to obtain construction financing." R. 239 at 3. Alternatively, the Bank contends that even if its breach caused Lakeview's loss, that loss was not a foreseeable consequence of the Bank's breach at the time the parties entered into the Existing Space Lease. *Id.* at 5.

---

would reconsider it upon review of the partial summary judgment briefs. *Id.* at 5 n. 3. Federal Rule of Civil Procedure 56(a), amendment effective December 1, 2010, provides "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." This provision was added "to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56, Advisory Comm. Notes, 2010 Amendments, Sub. (a). The Supreme Court in its order approving the amendments ruled that the amended version of Rule 56 governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable." Lakeview has not asserted it would be unjust or impracticable to apply the new version of Rule 56 here. Nor would Lakeview be prejudiced by consideration of the merits of the Bank's summary judgment motion for as discussed below, the Court determines that summary judgment is unwarranted.

At the outset, the Bank asserts that the proximate cause inquiry, ordinarily applied in tort, is also an element of a breach of contract claim. Lakeview, assuming that the tort causation principles apply to breach of contract cases, argues that (1) the Bank has not demonstrated that Lakeview fails to satisfy Illinois's "but for" or "substantial factor" tests; and (2) it was reasonably foreseeable that a breach by the Bank would cause Lakeview to lose the funds and expenses it paid to develop the project in reliance on the Bank's agreement to pay the carry costs of the property until construction financing was obtained. The Court expresses doubt as to whether the proximate cause inquiry applied in tort applies to breach of contract cases. The cases the Bank cites in support of this proposition do not squarely support that this is the case under Illinois law.[12]

In any event, the Court finds that a genuine issue of material fact exists on whether the Bank's breach was a cause in fact of Lakeview's losses. Under Illinois law, proof of proximate cause requires proof of both "cause in fact" and "legal cause."

---

[12] *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996) was an admiralty case, not an Illinois breach of contract case. *A.W. Wendell & Sons, Inc. v. Qazi*, 254 Ill.App.3d 97 (2d Dist. 1993), the only Illinois case the Bank cites, involved an affirmative defense where the defendant argued that the plaintiff breached its duty of substantial performance. The appellate court summarily resolved the issue presented, holding that defendant had failed to demonstrate that the plaintiff breached its contractual duty and that the damage was a proximate cause of that breach. Given the lack of analysis and citation to any other Illinois cases in *A.W. Wendell & Sons*, the Court does not find that case to definitively hold that the proximate cause analysis from tort applies in a breach of a contract case. The same holds true for *Monarch Gems v. Malca-Amit USA, LLC*, No. 04 C 7664, 2007 WL 2892636 (N.D. Ill. Sept. 27, 2007), and *Premier Transport v. Nextel Commc'ns, Inc.*, No. 02 C 4536, 2003 WL 21267096 (N.D. Ill. June 2, 2003), neither of which deal with a breach of contract like the one involved in the present case.

*Thacker v. UNR Inds. Inc.*, 151 Ill.2d 343, 354 (1992). Illinois courts use two tests in considering cause in fact (1) the "but for" test; and (2) the "substantial factor" test. *Id.* The Bank has not argued that no genuine issue of material fact exists as to whether Lakeview satisfies the substantial factor test.[13] As for the "but for" test, the Court finds that a genuine issue of material fact exists as to whether but for the Bank's breach, Lakeview's losses would not have occurred. Under Illinois's "but for" test, "a defendant's conduct is not a cause of an event if the event would have occurred without it." *Id.* at 354. But as discussed above and will be again discussed below, a genuine issue of material fact exists, or at least a trier of fact could determine, that the intent of the parties was that the Bank would pay the carry costs or rent under the Existing Space Lease—so long as Lakeview was in good faith pursuing construction financing—until such time as Lakeview obtained such financing.

As for the question of foreseeability, "[a] person breaching a contract can be held liable for such damages as may fairly and reasonably be considered as naturally arising from the breach thereof in light of the facts known or which should have been known or such as may reasonably be supposed to have been within the contemplation of the parties as a probable result of a breach thereof." *Sovereign Chemical & Petroleum Prods., Inc. v. Ameropan Oil Corp.*, 148 F.R.D. 208, 212 (N.D. Ill. 1992) (quoting *Case Prestressing Corp. v. Chicago College of Osteopathic*

---

[13] Under Illinois's substantial factor test, "the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about." *Thacker*, 151 Ill.2d at 354-55 (noting test was adopted by Restatement (Second) of Torts).

*Medicine*, 118 Ill.App.3d 782, 788 (1st Dist. 1983)); *see also Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 318 (1987) (stating in breach of contract action, party can recover damages that naturally and generally result from breach or where damages were consequences of special circumstances and were foreseeable and within reasonable contemplation of parties at time parties entered contract); *Talerico v. Olivarri*, 343 Ill.App.3d 128, 132 (1st Dist. 2003) (citing Restatement (Second) of Contracts § 351 (1981) ("Damages are not recoverable for loss that the breaching party did not have reason to foresee as a probable result of the breach when the contract was made.").

Considering the facts that were known to the parties at the time that they entered the lease and purchase agreement, as discussed above with respect to count I, a fact-finder could reasonably find that the parties specifically bargained that the Bank would pay the carry costs of the Main Parcel while Lakeview made its best efforts to pursue and obtain construction financing and that it would continue to pay those carry costs until Lakeview was able to obtain such financing or stopped looking. A fact-finder could also reasonably conclude that at the time the parties entered into the agreements, they contemplated that the lease could last, not in perpetuity, but for a lengthy period of time. PSAF ¶¶ 13, 15. Having established the nature and purpose of the deal, the question then becomes whether in light of that purpose, it was within the contemplation of the parties—or it was reasonably foreseeable—that a failure by the Bank to pay the rent on the Existing Space Lease would cause Lakeview to lose the property. Because that is the inquiry, the Bank's

focus on the foreseeability of the market crash and the cases on which they rely—
*Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998), *Guth v. Tazewell
County*, 698 F.3d 580 (7th Cir. 2012), and *Maxwell v. KPMG, LLP*, 520 F.3d 713
(7th Cir. 2008)—are not entirely on point. In other words, the question is not
whether at the time the parties executed the Existing Space Lease it was
reasonably foreseeable that the market would collapse. Rather, it is whether at the
time the parties executed the Existing Space Lease, it was reasonably foreseeable
that a breach by the Bank to pay under the lease would cause Lakeview's losses if
delay of construction was caused by Force Majeure or any other event.

Lakeview contends that so long as the Bank continued to pay rent under the
Existing Space Lease, Lakeview could have obtained extensions of its acquisition
loan with its lender and would have obtained construction financing and been able
to proceed with development. Ultimately, Lakeview says, no foreclosure action
would have been necessary. The Bank disputes this, denoting that contention and
the evidence supporting it as "nothing but rank speculation." R. 281 at 5. Such
evidence, according to the Bank, is insufficient to allow a trier of fact to reach a
factual conclusion in Lakeview's favor without engaging in undue speculation. In
fact, the Bank says, Barket's deposition testimony—that Lakeview did not know
"how long the bank would have agreed to an extension" even if "Bank of America
had continued to pay rent under the lease"—demonstrates that no genuine issue
exists as to whether Lakeview could have gotten an extension of the loan. R. 243-9
at 25.

48

A review of the entirety of the exchange at Barket's deposition reveals that this testimony is taken out of context. Barket first testified that if the Bank had continued to pay rent under the Existing Space Lease, Lakeview could have obtained an extension for the Wells Fargo loan based on the credit of the Bank and on the fact that the lease payments were structured to pay the interest due under the mortgage. *Id.* Barket added that he had discussions with individuals from Wells Fargo who told Lakeview that Wells Fargo would continue to give extensions so long as the Bank continued to pay rent under the lease. *Id.* When asked how long the extension would be for, Barket answered:

A:    We didn't talk about specific time frames, because, you know, the—tenant went into default.

Q:    So do you know long an extension the bank would have given if the tenant had not gone into default?

A:    I—I don't believe the—the bank would have more than annual one-year-long extensions that they would have continued to renew.

Q:    Okay. But you don't know how long the bank would have agreed to an extension for it, if Bank of America had continued to pay rent under the lease. Right?

A:    That's correct.

*Id.* Barket then went on to testify that if the loan had not gone into default, Lakeview would have been able to obtain construction financing "[b]ased upon the way we underwrote the deal initially and the economy coming back." *Id.* He further testified that "I don't know that [the economy] is back to a point where it could be financed today. I just know that ultimately, the project can—would most likely be

financed." *Id.* Barket's deposition testimony ultimately reveals that part of the reason for the uncertainty surrounding Lakeview's ability to obtain further extensions from its lender long enough to obtain construction financing is due to the Bank's decision to forego rent payments under the lease. Accordingly, in light of these circumstances, there is presently sufficient evidence to allow a fact-finder to reach a factual conclusion regarding the future ability of Lakeview to obtain further modifications of the loan without engaging in undue speculation. Given this testimony and the other evidence Lakeview points to demonstrating that the parties contemplated that the Bank's obligation under the Existing Space Lease would continue until Lakeview obtained construction financing—which the Court has declined to strike—the Court finds that a genuine issue of material fact exists as to whether it was foreseeable that a breach by the Bank would cause Lakeview's losses, thereby precluding summary judgment for the Bank on count III.

## B.     Calculation of Damages

Lakeview has provided the following computation of its reliance losses: (1) Lakeview made an initial $5 million investment into the property; (2) it then contributed an additional $2,562,070 in 2008; (3) took a distribution of $113,723 in 2009; and (4) then contributed $30,721 in 2010, totaling $7,479,070 in lost equity damages. R. 272 at 13; *see also* PSAF ¶ 35. The initial $5 million investment figure is not in dispute. Rather, the Bank takes issue with the "$2.5 million or so of purported 'pre-development expenses,'" arguing that Lakeview's calculation of this

figure is not reasonable, and accordingly, Lakeview cannot submit its theory of damages to the trier of fact.[14]

In Illinois, "[i]n order to plead a cause of action for breach of contract, a plaintiff must allege: (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) a breach by the defendant, and (4) resultant damages." *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill.App.3d 752, 759 (1st Dist. 2004)). To recover for a breach of contract, a plaintiff must establish both that it, in fact, sustained damages and a "reasonable basis for computation of those damages." *TAS Distributing*, 491 F.3d at 632 (quoting *Ellen v. Chicago Area Office Fed. Credit Union*, 216 Ill.App.2d 101, 106 (1st Dist. 1991)).

A party injured by another's breach of a contract may seek recovery in the form of damages based on its expectation interest—obtaining the benefit of the bargain—or its reliance interest—reimbursement for loss caused by reliance on a contract. *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6, 14 (1st Dist. 2006) (citing Restatement (Second) of Contracts § 344 (1981)). Illinois law thus allows an injured party to recover, as an alternative measure of damages, "its expenditures in partly performing its own obligations under [a]

---

[14]  The parties seem to agree on two propositions: (1) Lakeview cannot recover both reliance damages and expectation damages (damages for lost rent), R. 272 at 11; and (2) if Lakeview can provide a reasonable basis for its reliance damage calculations, Lakeview can present both alternative damage theories to the trier of fact, R. 281 at 13. The point of contention is whether Lakeview has established a reasonable basis for its calculation of its reliance losses.

contract as an alternative measure of damages where the usual method would be too speculative." *Herbert W. Jaeger & Assocs. v. Slovak Am. Charitable Ass'n.*, 156 Ill.App.3d 106, 113 (2d Dist. 1987) (citing Restatement of Contracts § 333 (1932); Restatement (Second) of Contracts § 349 (1981) ("As an alternative to the measure of damages stated in § 347 [expectation damages], the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.")). Remedies for injury to a reliance interest are defined as "being reimbursed for loss caused by reliance on the contract by being put in as good a position as [the injured party] would have been in had the contract not been made." Restatement (Second) of Contracts § 344(b) (1981).

The Bank puts forth two arguments for why Lakeview's calculations of its reliance losses are not reasonable. First, according to the Bank, the expenses accounted for in Lakeview's $2.5 million expense calculation were incurred by Centrum Properties—the real estate development company of which the Lakeview principals were members—not Lakeview, and Lakeview has not demonstrated it has an obligation to repay Centrum that amount. R. 239 at 14. Second, the Bank argues that Lakeview has not demonstrated a net reliance loss because its current calculation does not account for rent, such as the $4.5 million in rent it received from the Bank, or "other benefits" received by Lakeview. R. 281 at 13. Neither of these arguments warrants the grant of summary judgment on count III.

52

As Lakeview argues, the Bank misunderstands the basis for its reliance damage losses. The reliance damage loss is not for any overhead that Centrum allocated to Lakeview or compensation for any Centrum employee time spent working on Lakeview-related matters. McLinden's testimony, which the Bank does not dispute, establishes this fact. PSAF ¶ 36. Moreover, McLinden's testimony further establishes that the overhead that Centrum allocated to Lakeview was not actually paid by Lakeview. *Id.* ¶ 37. The Bank assumes that because (1) Lakeview bought the property for $20,250,750; (2) the property was sold to Wells Fargo for $20.4 million, discharging its debt; and (3) Lakeview received $4.5 million in rent from the Bank, Lakeview has no reliance damages. In fact, under this calculation, Lakeview actually came out ahead. But this argument fails to acknowledge, as established by Lakeview's tax returns, which the Bank has not challenged, Lakeview's $5 million initial investment and its $2.5 million out-of-pocket costs in pre-development expenses.[15] As for the rent that Lakeview received, that rent, according to Lakeview, was "recycled back to the lenders, including LaSalle," an assertion the Bank also does not challenge. R. 272 at 14.[16] At this stage, Lakeview must establish a reasonable basis for its computation of its reliance damages. Lakeview has met this burden. The Bank is free to reassert these arguments at

---

[15] The $2.5 million in pre-development expenses that Lakeview is seeking is its out-of-pocket costs, what Lakeview purportedly spent in reliance on the agreement with the Bank. For that reason, the Court declines to limit, as the Bank suggests, Lakeview's potential recovery to $1.75 million, Lakeview's initial budget for such expenses at the outset of the project.

[16] Lakeview confirmed this fact at the April 18th hearing.

trial, but at this stage, Lakeview has presented sufficient evidence to at least present its reliance damage theory to the trier of fact.[17]

## IV.    Outstanding Motions

Also before the Court are: (1) the Bank's Motion to Strike Lakeview's Supplemental Answer to Interrogatory No. 6 and Statements of Facts Based on Those Facts, R. 282; (2) the Bank's motion regarding the recent sale of the property to Target, R. 297; (3) Lakeview's motion for leave to take a Rule 30(b)(6) deposition of the Bank regarding its commercial lending practices, R. 304; and (4) Lakeview's motion to take limited discovery regarding witnesses recently identified in the Bank's untimely witness disclosures, R. 306. The Court rules as follows:

On consideration of the Bank's motion regarding the recent sale of the property located at 3201 North Ashland to Target Corporation, R. 297, the Bank's request to take a deposition of a Target representative is denied. The Court reserves ruling on whether evidence of the sale of the property to Target is admissible.

Lakeview's motion for leave to take a Rule 30(b)(6) deposition of the Bank regarding its commercial lending practices, R. 304, is denied.

Lakeview's motion to take limited discovery regarding witnesses recently identified in the Bank's untimely witness disclosures, R. 306, is denied. The parties

---

[17]    The Bank requests that the Court order that "amounts, if any, recovered by [Lakeview] for rent under the Existing Space Lease must be offset against or shall reduce [Lakeview's] recovery, if any, of its 'lost equity' or reliance damages." R. 281 at 14. Should Lakeview recover reliance damages at trial, the Court will address the precise calculation of damages then. The Court, however, notes (as the parties agree), Lakeview will not be allowed to receive damages that would count as a duplicative recovery.

seem to indicate that most of these witnesses are not likely to be called at trial. Discovery in this case has been long closed. If the Bank decides to actually call any of these witnesses and the Court allows their testimony, the Bank will have to make them available for a short discovery deposition prior to their testimony (possibly on a weekend or at off hours during trial).

Finally, two motions are scheduled to be heard on May 1, 2013. The Court would like a brief discussion as to whether the entirety of the trial or only certain counts should be tried to a jury.

## Conclusion

For the foregoing reasons, the Bank's motions to strike and for partial summary judgment are denied. The Bank's motion regarding the recent sale of the property to Target, Lakeview's motion for leave to take a Rule 30(b)(6) deposition of the Bank regarding its commercial lending practices, and Lakeview's motion to take limited discovery regarding witnesses recently identified in the Bank's untimely witness disclosures are also denied.

ENTERED:

Thomas M. Durkin
United States District Judge

Dated: April 29, 2013